2024 IL App (3d) 230113

Opinion filed April 19, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-23-0113 Circuit No. 20-CF-348 |
| DOMINIQUE D. TRAVIS, | ) ) | Honorable Daniel D. Rippy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justices Hettel and Peterson concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Dominique D. Travis, appeals his convictions for being an armed habitual criminal (AHC) and unlawful use of a weapon by a felon (UUWF), arguing (1) the State did not prove beyond a reasonable doubt that he possessed an actual firearm, (2) the statutes criminalizing the possession of weapons by felons are unconstitutional both facially and as applied to defendant, and (3) defendant's convictions violate the one-act, one-crime doctrine. We vacate defendant's two UUWF convictions and otherwise affirm the trial court's judgment.

¶ 2                                I. BACKGROUND

¶ 3        Defendant was charged with AHC (720 ILCS 5/24-1.7(a)(2) (West 2020)) and two counts of UUWF (*id.* § 24-1.1(a)). The case proceeded to a bench trial on April 21, 2021. At trial, Detective Jeffrey German testified that on October 22, 2019, defendant and defendant's cousin, Dameonta Terry-Travis, created three videos using Dameonta's cell phone showing both of them holding handguns while sitting in a car with a third person. German located the videos after performing a parole check on Dameonta on January 31, 2020. A subsequent search of Dameonta's residence revealed two firearms: a Springfield semiautomatic handgun and a Taurus PT111 9-millimeter semiautomatic handgun, along with ammunition. The State introduced the Taurus 9-millimeter into evidence.

¶ 4        The parties stipulated to the authenticity and admissibility of the videos, and German testified he believed the firearms depicted in the videos were real firearms similar to the firearms recovered from Dameonta's residence. German testified to his familiarity with firearms, having worked on cases involving firearms "[20], 30 times or more every year for the last 18 [years]." He testified to his familiarity with Taurus handguns and described the specific features and markings that led him to believe defendant was holding a Taurus PT111 9-millimeter handgun. German was unable to identify the serial number of the firearm held by defendant in the videos, but he testified Dameonta was holding one of the firearms recovered from his residence. The parties also stipulated defendant had been convicted of two prior qualifying felonies.

¶ 5        Defendant waived his right to testify, and the trial court found him guilty on all counts. In ruling, the court noted it was familiar with firearms and in fact had previously owned the same model of firearm brandished by defendant in the video. The court stated, "[I]f this is a replica, I would be shocked because of the markings on it, the mechanical aspects of the firearm." The court further stated its ruling was not based on whether the firearms recovered from Dameonta's

2

residence were the same firearms depicted in the video and that the video evidence was sufficient to determine defendant's guilt.

¶ 6    Defendant filed a posttrial motion, challenging the sufficiency of the State's evidence, which the court denied. At defendant's sentencing hearing, the State introduced a presentence investigation report (PSI), which revealed defendant had twice been convicted of unlawful possession of a weapon by a felon and aggravated battery. The trial court sentenced defendant to three concurrent eight-year prison terms, and this appeal followed.

¶ 7                                II. ANALYSIS

¶ 8    On appeal, defendant argues (1) the evidence was insufficient to convict where the State's evidence failed to establish defendant possessed an actual firearm, (2) the statutes under which defendant was convicted are unconstitutional, and (3) defendant's convictions violated the one-act, one-crime doctrine. We address each argument in turn.

¶ 9                        A. Sufficiency of the Evidence

¶ 10    First, defendant contends the State failed to prove beyond a reasonable doubt that he possessed an actual firearm and not a replica or a BB gun. When reviewing the sufficiency of the evidence, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not our function to retry defendant, nor will we substitute our judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. "[I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232

3

Ill. 2d 246, 281 (2009). We will reverse *only* if "the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 11     To convict defendant of AHC, the State had to prove defendant (1) possessed a firearm, and (2) was convicted of two or more qualifying offenses. See 720 ILCS 5/24-1.7(a) (West 2020). Defendant contends only that the State failed to prove he possessed an actual firearm.

¶ 12     Section 2-7.5 of the Criminal Code of 2012 (*id.* § 2-7.5) has adopted the definition of "firearm" found in section 1.1 of the Firearm Owners Identification Card Act (Act) (430 ILCS 65/1.1 (West 2020)), which states, " 'Firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, [or] expansion of gas ***." This provision specifically excludes, among other items, pneumatic guns, spring guns, paint ball guns, BB guns, signaling devices, and antique firearms. *Id.*

¶ 13     A trier of fact may make reasonable inferences from the established facts of the case (*People v. Patterson*, 2022 IL App (1st) 182542, ¶ 33) and may also rely on common sense and general knowledge in drawing inferences from the facts (*People v. Toliver*, 60 Ill. App. 3d 650, 652 (1978)). The State need not introduce into evidence the physical firearm for the trier of fact to find the defendant possessed one. *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 15. "[C]ourts have consistently held that eyewitness testimony that the offender possessed a firearm, combined with circumstances under which the witness was able to view the weapon, is sufficient to allow a reasonable inference that the weapon was actually a firearm." *Id.* In the absence of eyewitness testimony, video evidence of a defendant with a handgun has been enough to prove the defendant possessed a firearm. *People v. Collins*, 2021 IL App (1st) 180768, ¶ 54.

¶ 14        Here, the unrebutted evidence established defendant's possession of a firearm. The videos introduced by the State were sufficiently clear to allow German to identify both defendant and the specific model of the firearm possessed by defendant. German testified to his familiarity with firearms in general and with the particular firearm possessed by defendant in the videos. This evidence, taken with the fact that similar firearms were found in Dameonta's residence, allowed the circuit court to draw the reasonable inference that defendant possessed a real firearm as defined by the Act. See *McLaurin*, 2020 IL 124563, ¶ 36 (a trained and experienced officer with an unobstructed view provided sufficient evidence to establish defendant was armed with a firearm). The circuit court's own knowledge and experience further supported the reasonable inference that defendant possessed an actual firearm and not a replica or BB gun. See *Toliver*, 60 Ill. App. 3d at 652.

¶ 15                    B. Constitutionality of AHC and UUWF Statutes

¶ 16        Next, defendant raises, for the first time on appeal, a constitutional challenge to the AHC and UUWF statutes. Defendant argues these statutes improperly burden the right to keep and bear arms as guaranteed by the second amendment to the United States Constitution (U.S. Const., amend. II) and article I, section 22, of the Illinois Constitution (Ill. Const. 1970, art. I, § 22), both facially and as applied to him.

¶ 17        At the outset, the State requests we deem defendant's as-applied challenge forfeited because defendant failed to raise the issue in the circuit court. In general, defendants must raise as-applied constitutional challenges in the circuit court before they may be considered on appeal. *People v. Thompson*, 2015 IL 118151, ¶ 27. Defendant concedes he did not raise the issue previously but argues the record is sufficiently developed for us to review his claim, and upon review of the record, we agree. See *People v. Holman*, 2017 IL 120655, ¶¶ 29-32, *overruled on*

5

*other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42 (finding where all relevant facts and circumstances are contained in the record, a claim may be raised and reviewed on appeal).

¶ 18    The record contains defendant's criminal history, and the parties do not dispute its accuracy. The State contends the record does not detail whether defendant possessed a firearm while committing prior violent felonies nor for what purpose he possessed a firearm in the instant case. It is unclear how this information would aid us in determining whether the felon dispossession statutes have been constitutionally applied to defendant. The challenged statutes do not contain exceptions for self-defense or for any other conduct. We may therefore consider defendant's as-applied challenge under the second amendment. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 59-62.

¶ 19    Statutes are presumed to be constitutional. *People v. Wells*, 2023 IL App (3d) 210292, ¶ 19. "The party challenging the constitutionality of a statute bears the burden of rebutting this presumption and clearly establishing a constitutional violation." *People v. Funches*, 212 Ill. 2d 334, 339 (2004). Courts are obligated to construe statutes in a manner that upholds the statute's validity and constitutionality, if reasonably possible. *Id.* We review the constitutionality of a statute *de novo*. *Wells*, 2023 IL App (3d) 210292, ¶ 19.

¶ 20                         1. *United States Constitution*

¶ 21    Defendant contends the AHC and UUWF statutes are facially unconstitutional because they amount to a "permanent, status-based revocation of the right to keep and bear arms." Defendant additionally contends that, even if the statutes are not facially unconstitutional, they are unconstitutional as applied to him because the predicate offenses used to establish defendant's violations were nonviolent offenses and defendant was not acting violently or otherwise violating the law at the time of the instant offenses.

6

## a. Facial Challenge

The second amendment to the United States Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In 2022, the United States Supreme Court clarified the standard by which laws affecting the right to bear arms under the second amendment are to be reviewed. *New York State Rifle & Pistol Ass'n, Inc., v. Bruen*, 597 U.S. 1, 24 (2022). *Bruen* analyzed a New York law requiring residents to demonstrate "proper cause" when seeking a license to carry a loaded pistol and found the regulation failed to pass constitutional muster. *Id.* at 38-39. In reaching its conclusion, the Court determined that means-end scrutiny was not the appropriate lens through which to analyze such regulations (*id.* at 19) and announced a two-part analysis focused exclusively on history and tradition:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 24 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n.10 (1961)).

Stated another way, to find the statute constitutional, the two-part process requires us to determine (1) whether defendant's conduct falls within the plain text of the second amendment and, if so, (2) whether there is a justification for the regulation rooted in history and tradition. To meet the second prong, we must look to " 'historical precedent' from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 27 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 631 (2008)). When the second amendment's historically fixed

7

meaning is applied to new circumstances, courts must conduct a historical inquiry that involves reasoning by analogy. *Id.* at 28. Determining whether historical regulations are properly analogous to a modern firearm regulation requires courts to decide whether the two regulations are "relevantly similar." *Id.* at 29. Relevant similarities include, among other things, "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* The Court emphasized that " 'individual self-defense is "the *central component*" of the Second Amendment right.' " (Emphasis in original.) *Id.* (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), quoting *Heller*, 554 U.S. at 599).

¶ 25    Applying *Bruen*'s framework, we must first determine whether the second amendment's plain text covers defendant's conduct. *Id.* at 24. The second amendment states "the right of the people to keep and bear Arms[ ] shall not be infringed." U.S. Const., amend. II. The State urges us to find defendant is not a member of "the people" to whom the second amendment applies because of his status as a felon. However, the Supreme Court in *Heller* defined "the people" as "all Americans," and we see no reason to depart from that definition. *Heller*, 554 U.S. at 581. The "plain text" of the second amendment contains no caveats exempting felons, and we decline to read additional language into this straightforward first step. See *United States v. Collette*, 630 F. Supp. 3d 841, 844 (W.D. Tex. 2022) ("***Bruen*'s first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm.").

¶ 26    In reaching this conclusion, we note different panels of this court have disagreed about whether felons fall within the amendment's scope. For instance, in *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37, one panel of the First District concluded non-law-abiding citizens are not part of "the people" to whom the second amendment applies. But in *Brooks*, 2023 IL App (1st) 200435, ¶ 89, a different panel found as we have that the second amendment's plain language does not

8

exclude felons. While we acknowledge both courts ultimately concluded *Bruen* does not prohibit the disarmament of felons, we adopt the reasoning set forth in *Brooks*.

¶ 27 Accordingly, we turn to *Bruen*'s second step. Here, we must consider whether the AHC and UUWF statutes are rooted in this nation's history and tradition of firearms regulation. We begin by noting that the right to bear arms has never been unlimited. As the Supreme Court pointed out in *Heller*:

> "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. [Citations.] For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626.

Indeed, "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Bruen*, 597 U.S. at 38.

¶ 28 The Supreme Court has observed that the prohibition on felons possessing firearms is both "longstanding" and consistent with historical tradition. *Heller*, 554 U.S. at 626-27. Yet, as defendant points out, felon dispossession statutes are a product of the twentieth century—felons were not broadly prohibited from possessing firearms federally until 1961. *Collette*, 630 F. Supp. 3d at 845. In Illinois, the first criminal statute temporarily prohibiting felons from possessing firearms was passed in 1967. *Brooks*, 2023 IL App (1st) 200435, ¶ 103.

¶ 29    However, such laws evolved from preexisting prohibitions restricting access to firearms. The most directly relevant federal precursor to modern statutes disarming felons was the Federal Firearms Act of 1938, which was designed to address an unprecedented societal concern: an " 'increase in organized crime and gangster violence.' " *United States v. Banuelos*, 640 F. Supp. 3d 716, 723 (W.D. Tex. 2022) (quoting Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 115-16 (2013)). More broadly, "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people." *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023).

¶ 30    The government has historically promoted public safety by protecting society from persons it deems to be dangerous. Gun safety regulations were "commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books" including "laws disarming certain groups and restricting sales to certain groups." *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. at 19. So-called "going armed" laws prohibited persons from "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50. Other ratification-era laws disarmed people feared to be disloyal to the government. *Kanter v. Barr*, 919 F.3d 437, 457-58 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated on other grounds by Bruen*, 597 U.S. at 19. Such individuals included British loyalists whom authorities believed could not be trusted to remain loyal to the newly founded American government. See *United States v. Washington*, No. 23-cr-00274, 2023 WL 8258654, at *6 (N.D. Ill. Nov. 29, 2023).

¶ 31    The concept of disarming criminals dates at least to Pennsylvania's ratifying convention, at which it was proposed that the right to bear arms be guaranteed " '*unless for crimes committed,*

*or real danger of public injury from individuals.*' " (Emphasis added.) *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675 (1971)). Other colonies adopted the concept of attainder, a status applied to the "disaffected" and "delinquents," which resulted in the forfeiture of property and loss of civil rights, including disarmament. *United States v. Coombes*, 629 F. Supp. 3d 1149, 1157 (N.D. Okla. 2022). "In colonial America, legislatures continued to disarm individuals whose status indicated that they could not be trusted to obey the law." *Brooks*, 2023 IL App (1st) 200435, ¶ 94.

¶ 32 Reasoning by analogy, as *Bruen* instructs, we find these regulations provide a "historical analogue" to the AHC and UUWF statutes. (Emphasis omitted.) *Bruen*, 597 U.S. at 30. At this second step of *Bruen*'s analysis, it is also highly relevant that the proposed legislation has almost no effect on a " 'law-abiding, responsible' " citizen's right to armed self-defense, which the second amendment " 'elevates above all other interests.' " *Id.* at 26 (quoting *Heller*, 554 U.S. at 635); *Banuelos*, 640 F. Supp. 3d at 722-23 (observing the question of how a defendant's "prior felony might impact his Second Amendment right to possess a firearm is more properly addressed under step two's historical tradition analysis").

¶ 33 In sum, we conclude there is a history and tradition dating back to the founding era of identifying dangerous individuals and disarming them. See *Jackson*, 69 F.4th at 505. Our holding is consistent with *Bruen*'s discussion of state-administered firearms licensing regimes, which "often require applicants to undergo a background check or pass a firearms safety course, [and] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' " *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). The AHC and UUWF statutes are consistent with this nation's history of preventing potentially dangerous individuals from exercising the right to bear arms, and their effects on law-abiding citizens' right

11

to self-defense are minimal. *Id.* at 29; see *People v. Mobley*, 2023 IL App (1st) 221264, ¶¶ 29-30 (observing individuals convicted of multiple felonies, including violent felonies, are incontrovertibly not "law-abiding citizens"). Therefore, the statutes at issue, here, are facially constitutional.

¶ 34                                              b. As-Applied Challenge

¶ 35         The distinction between an as-applied challenge and a facial challenge "goes to the breadth of the remedy employed by the Court." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010). An as-applied challenge requires a showing that the statute violates the constitution as it applies to defendant's particular facts and circumstances, whereas a facial challenge requires a showing that the statute is unconstitutional under any set of facts. *Thompson*, 2015 IL 118151, ¶ 36. Defendant argues (1) his actions in possessing a firearm were presumptively lawful because he was not acting violently at the time of his offense and (2) the qualifying offenses used to convict defendant of AHC were also "non-violent, possessory offenses."

¶ 36         Defendant presents no coherent argument as to why his nonviolence at the time of the offense should affect whether the State can disarm him for being a felon, nor can we find any. According to the AHC statute and the UUWF statute, the relevant unlawful conduct consists of (1) having prior felony convictions and (2) possessing a firearm. See 720 ILCS 5/24-1.1(a), 24-1.7(a) (West 2020). Neither statute distinguishes between violent and nonviolent conduct at the time of the offense. Moreover, the State is free under the UUWF statute to use any of defendant's prior felonies to sustain defendant's convictions, and defendant's PSI reveals he has been convicted of at least two violent felonies, namely two separate aggravated batteries. Defendant is, therefore, precisely the type of person the government has historically and traditionally sought to disarm. See *Kanter*, 919 F.3d at 467 (Barrett, J., dissenting).

12

¶ 37    Even if defendant had been convicted of only nonviolent felonies, we would reject defendant's invitation to second-guess the legislature's determination of which crimes merit felony status and, consequently, disarmament. See *Atkinson v. Garland*, 70 F.4th 1018, 1026-27 (7th Cir. 2023) (Wood, J., dissenting). Under the AHC and UUWF statutes, both of which are facially constitutional, defendant is prohibited from possessing a firearm due to his status as a felon, irrespective of the violent or nonviolent nature of his convictions. We decline to invade the province of the legislature to determine which convictions warrant a loss of rights. As Justice Wood observed,

> "The Judiciary cannot be in the position of looking at prior offenses identified by Congress and second-guessing Congress's decisions both with respect to criminalization and to sentencing exposure. *** Such a system would impose impossible burdens on courts and prosecutors and would lead to an arbitrary patchwork of decisions—as far from the rule of law as one could imagine." *Id.*

Thus, we find that the statutes are also constitutional as applied to defendant.

¶ 38                                    2. *Illinois Constitution*

¶ 39    Defendant next claims the AHC and UUWF statutes violate article I, section 22, of the Illinois Constitution facially and as applied to him. Defendant argues the Illinois Constitution provides greater protection than the second amendment.

¶ 40    Article I, section 22, provides: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. 1970, art. I, § 22. There are two important differences between this portion of the Illinois Constitution and the federal constitution. First, it replaces the prefatory language concerning the necessity of a well-regulated militia with the words " '[s]ubject only to the police power.' " *Kalodimos v. Village of Morton Grove*, 103 Ill.

13

2d 483, 491 (1984) (quoting Ill. Const. 1970, art. I, § 22). Second, it replaces "the people" with " 'the individual citizen.' " *Id.* (quoting Ill. Const. 1970, art. § 22). In *Kalodimos*, our supreme court held the inclusion of the phrase "the individual citizen" was intended to "broaden the scope of the right to arms from a collective one applicable only to weapons traditionally used by a regulated militia [citation] to an individual right covering a wider variety of arms." *Id.*

¶ 41    In contrast, the inclusion of the words " '[s]ubject only to the police power' " was intended "as a limitation on the liberty the provision affords." *Id.* The police power was intended to provide an " 'extraordinary degree of control' " over the possession and use of arms due to the " 'extraordinary threat to the safety and good order of society' " posed by such weapons. *Id.* at 491-92 (quoting 6 Record of Proceedings, Sixth Illinois Constitutional Convention 88 (report of the committee on the bill of rights)). The court found "that the police power comprehends laws 'restraining or prohibiting anything harmful to the welfare of the people.' " *Id.* at 496 (quoting *People v. Warren*, 11 Ill. 2d 420, 425 (1957)).

¶ 42    As discussed above, we reject the State's request to hold that defendant is not a member of "the people" for the purpose of applying the second amendment. *Supra* ¶ 26. We similarly reject the State's contention that article I, section 22, does not apply to defendant. However, having found felons are not excluded from either constitutional clause, we cannot ignore our supreme court's observation that the inclusion of the prefatory clause "[s]ubject only to the police power" was intended to grant the government an "extraordinary degree of control" over the use of firearms. (Internal quotation marks omitted.) *Kalodimos*, 103 Ill. 2d at 491-92. While it is well established that a state *may* impose greater protections under its state constitution and may not reduce its protections below the minimum required by the federal constitution (see, *e.g.*, *Oregon v. Hass*, 420

14

U.S. 714, 719 (1975)), defendant presents no compelling argument that Illinois has elected to impose greater protections, nor does our independent review find this to be the case.

¶ 43    In support of his as-applied challenge, defendant contends the framers of the Illinois Constitution were more concerned with violence than with felon status. Even if we accept defendant's argument, it fails because, as noted above, he has been convicted of violent acts. *Supra* ¶ 36. We find the AHC and UUWF statutes are a proper exercise of the state's police power, which allows the state to exert, through legislation, control over the dangers posed by firearms and the people who might use them to do harm. See *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶ 18. Accordingly, defendant has failed to demonstrate the challenged statutes violate the Illinois Constitution either facially or as applied to him.

¶ 44                        C. One-Act, One-Crime Violation

¶ 45    Finally, defendant asserts his UUWF convictions violate the one-act, one-crime doctrine. The State notes defendant forfeited the error but nevertheless concedes plain error. See *People v. Coats*, 2018 IL 121926, ¶ 10 (one-act, one-crime violations are reviewable under the second-prong of the plain-error doctrine). We accept the State's concession.

¶ 46    The one-act, one-crime doctrine prohibits multiple convictions based on a single physical act or acts. *People v. West*, 2017 IL App (1st) 143632, ¶ 24. When two or more convictions are based on a single act, the sentence imposed for the less serious offense should be vacated. *Id.* To determine which offense is more serious, courts generally compare the relative punishments prescribed by the legislature. *People v. Artis*, 232 Ill. 2d 156, 161 (2009).

¶ 47    Here, defendant's act of possessing a firearm resulted in three convictions—AHC and two counts of UUWF. As the State concedes, the three convictions stem from a single physical act, defendant's possessing a firearm. AHC is a Class X felony (720 ILCS 5/24-1.7(b) (West 2020)),

15

while the two convictions for UUWF are Class 2 felonies (*id.* § 24-1.1(e)). Defendant's conviction for AHC is therefore the most serious offense. Accordingly, we vacate defendant's two UUWF convictions.

¶ 48                                               III. CONCLUSION

¶ 49         For the reasons stated, we vacate defendant's two UUWF convictions and otherwise affirm the judgment of the circuit court of Will County.

¶ 50         Affirmed in part and vacated in part.

*People v. Travis*, 2024 IL App (3d) 230113

| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 20-CF-348; the Hon. Daniel D. Rippy, Judge, presiding. |
| --- | --- |
| **Attorneys for Appellant:** | James E. Chadd, Santiago A. Durango, and Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |