**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240378-U

Order filed June 24, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0378 Circuit No. 22-CF-988 |
| BRADLEY A. BALLARD, | ) ) ) | Honorable Amy M. Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Brennan and Justice Anderson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: (1) The court did not abuse its discretion in allowing the State to elicit certain testimony from the victim, (2) the State's remark during closing arguments as to the victim's trauma was not improper, (3) defendant did not receive ineffective assistance of counsel, and (4) the unlawful possession of a weapon by a felon statute under which defendant was convicted is facially constitutional. Affirmed.

¶ 2    Following a jury trial, defendant, Bradley A. Ballard, was convicted of unlawful possession of a weapon by a felon (UPWF), reckless discharge of a firearm, and domestic battery. Defendant appeals, arguing (1) he was denied his right to a fair trial when the circuit court allowed the State

to elicit certain testimony and the State commented on it during closing arguments, (2) he received ineffective assistance of counsel, and (3) the UPWF statute is facially unconstitutional. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On July 14, 2022, defendant was charged with two counts of UPWF (720 ILCS 5/24-1.1(a) (West 2022)), two counts of reckless discharge of a firearm (*id.* § 24-1.5(a)), and domestic battery (*id.* § 12-3.2(a)(2)). The matter proceeded to a jury trial in October 2023. During opening arguments, defense counsel posited the allegations were unbelievable. The following evidence was presented.

¶ 5        Jamita Swearengen testified she married defendant in 2018 and had three children with him. At the time of the trial, their children were one, three, and five years old. Swearengen and defendant separated in October 2019, but they continued to reside with her parents where Swearengen lived upstairs while defendant lived in the basement. On June 21, 2022, defendant drove Swearengen's vehicle to a job interview and Swearengen waited with the children in the vehicle. On the way home, Swearengen and defendant argued over defendant not having his own vehicle. Defendant stopped at a gas station, pulled a gun from his bag, turned toward the back seat, aimed the gun at the children, and threatened to shoot them. Swearengen tried to get the gun from defendant and began punching him. Defendant eventually calmed down and put the gun away. Defendant left the car and walked away while Swearengen drove home.

¶ 6        When Swearengen arrived home, defendant appeared and started helping her get the children out of the car. Once inside, she walked upstairs to the children's bedroom to change a diaper. Defendant grabbed her, dragged her through the hallway into her bedroom, and threw her onto the bed. She heard a "loud pop," smelled gun smoke, and saw defendant holding a gun. She saw a bullet hole in the wall above her shoulder. Defendant picked up a shell casing, noted it was

2

still hot, and asked her if she wanted to feel it. One of the children called out for them, and defendant walked downstairs. Swearengen returned to changing the baby's diaper when defendant reappeared and pushed Swearengen onto one of the children's beds. Defendant fired another shot over her shoulder into the wall. Defendant continued to argue and then punched the wall. He pointed the gun at the baby's face, stating he should start with the baby because he did not believe it was his anyway. Defendant put the gun in the baby's mouth. Defendant said he did not know what he was doing and left the room. Swearengen walked downstairs and defendant tried to talk to her, but she ignored him. Defendant knocked a bowl out of her hands and pointed the gun to his own head. Defendant finally left the home.

¶ 7        Swearengen locked the door and unsuccessfully looked for her phone. Her father, brother, and cousin arrived. Defendant tried to follow them inside, but Swearengen told him to stay out. She did not tell her family that defendant had a gun because she thought it would incite an argument, and she did not want anyone to get shot. Swearengen's mother then returned home, and, after talking with her mother, Swearengen called the police. The police arrived at 8:40 p.m. and Swearengen reported the incident occurred at 5 p.m. or "approximately two hours" before the police arrived. Swearengen told the police defendant pointed the gun at their children in the vehicle, but did not indicate the incident occurred at a gas station. The next day, Swearengen filed for an order of protection against defendant.

¶ 8        Approximately one week later, Swearengen received a video message from defendant telling her not to testify. She received another message from defendant while he was in jail telling her to say he did not have a gun, he did not do anything to her, she was upset, and she said things she did not mean. Defendant stated he had changed and would be a better man to her and father to their children. The video message and jail message were admitted for the limited purpose of

3

showing defendant's identity and lack of mistake. Swearengen viewed photographs and identified the bullet holes, the hole caused by defendant punching a wall, and the shell casing on the floor. Defendant made no admission to police as to his possession or usage of the gun, the gun was never recovered, and defendant's fingerprints were not on the shell casing found at the scene.

¶ 9 The prosecutor asked Swearengen if this was a traumatic event. She stated it was, and she was struggling to cope with the events of that day. Defense counsel objected, arguing the question was more prejudicial than probative. The court overruled the objection. During cross-examination, the defense thoroughly questioned Swearengen regarding her recollection of the timing of events and pointed out that she had given inconsistent answers throughout the case. On recross-examination, Swearengen testified she did not understand the process for collecting evidence, and because it was an extremely traumatic event, she was still recalling details she did not initially report and had difficulty recalling certain details. Later, during closing arguments, the prosecutor commented on the message defendant sent to Swearengen from jail stating defendant wanted to fix things between them and the prosecutor suggested the damage had been done, such as "[t]he emotional trauma that [Swearengen] will live with for the rest of her life."

¶ 10 Bridget Young, Swearengen's neighbor, testified that on the day of the incident, she hosted a pool party in her backyard and did not hear gunshots. She indicated her home was located near two busy intersections and directly behind a movie theater. Considering the hot temperature that day, she assumed most homes in the area had their windows closed and air conditioners running.

¶ 11 Defendant stipulated he had previously been convicted of a felony offense, which the jury was instructed to only consider for the limited purpose of establishing defendant's felon status for the UPWF offense. The prior felony conviction arose out of Georgia for cruelty to children, but the jury was not provided these details. The jury found defendant guilty of all counts. Thereafter,

4

defendant filed a motion for judgment notwithstanding the verdict, or alternatively, a new trial. Defendant argued, *inter alia*, his conviction for UPWF was facially unconstitutional, Swearengen's testimony was insufficient to prove him guilty, and the court erred in allowing Swearengen to testify she was still struggling with the events that occurred. The court denied the motion and sentenced defendant to concurrent sentences of 10 years' imprisonment for UPWF and 6 years' imprisonment for reckless discharge of a firearm. The court sentenced defendant to 364 days in jail for domestic battery with credit for 364 days of time served. Defendant filed a motion to reconsider the sentence, which the court denied. This appeal followed.

¶ 12                                    II. ANALYSIS

¶ 13        On appeal, defendant argues (1) he was denied a fair trial when (a) the court allowed the State to elicit testimony from Swearengen regarding the traumatic nature of the events, and (b) the State made an improper remark during closing arguments in reference to this testimony; (2) he received ineffective assistance of counsel where his counsel failed to (a) move for severance of the UPWF charge, and (b) object to various statements made by the State in closing arguments; and (3) the statute under which he was convicted for UPWF is facially unconstitutional.

¶ 14                              A. Right to a Fair Trial

¶ 15        Defendant argues the court erred in allowing Swearengen to testify regarding the traumatic nature of the events and such error denied him a fair trial. He states this evidence did not advance the jury's search for the truth and it misled the jury to decide the case based on raw passions and emotions.

¶ 16        Evidence is admissible where it fairly tends to prove or disprove the offense charged and is relevant in making the question of guilt more or less probable. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007). A circuit court's evidentiary ruling is within its sound discretion and will not be

5

disturbed on appeal absent a clear abuse of discretion. *Id.* "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 17    Here, we conclude the court did not abuse its discretion in allowing the State to elicit this testimony. Defendant's trial strategy from the outset was to place Swearengen's credibility at issue, as evinced by defense counsel's opening statement that Swearengen's allegations were unbelievable. Throughout the trial, defense counsel took issue with Swearengen's inconsistent recollection regarding the timing of the events, as reported to police and during her testimony; her omission that the first incident with the gun occurred at a gas station, which prevented the timely acquisition of surveillance footage; and her delay in contacting the police. In response, the State elicited testimony from Swearengen demonstrating the events were traumatic and affected her ability to recall specific details and contact the police. This testimony was appropriate to explain Swearengen's actions, pretrial statements, and testimony. Defendant cannot now complain of the admission of this testimony which was invited by his own trial strategy. See *People v. Escobar*, 168 Ill. App. 3d 30, 44 (1988).

¶ 18    Defendant further argues he was denied a fair trial when the prosecutor referenced during closing arguments "[t]he emotional trauma that [Swearengen] will live with for the rest of her life." Defendant acknowledges he forfeited this issue by failing to raise it below but asks this court to review it under the second prong of the plain error doctrine. See *People v. Afandi*, 2024 IL App (1st) 221282, ¶ 27. Before applying either prong of the plain error doctrine, our first step is to determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 19    "Prosecutors are afforded wide latitude in closing argument." *Wheeler*, 226 Ill. 2d at 123. They may express an opinion based on the record and may draw reasonable inferences from the

6

evidence presented. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12. Further, prosecutors "may comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence." *People v. Nicholas*, 218 Ill. 2d 104, 121-22 (2005).

¶ 20    In this case, the prosecutor's remark was permissible based on the facts and circumstances presented. First, the prosecutor's remark was a reasonable inference from the evidence presented. See *People v. Tannahill*, 152 Ill. App. 3d 882, 888 (1987) (providing any reference to the complainant being traumatized was a reasonable inference from the evidence presented in view of the crimes charged). Swearengen testified as to the trauma she endured from the events, which we already concluded was proper (*supra* ¶ 17), and the prosecutor's remark that she would endure this trauma for the rest of her life was a reasonable inference. Second, the trauma Swearengen endured was an "evil effect[ ]" of the crime defendant committed, which was based on competent and pertinent evidence. See *Nicholas*, 218 Ill. 2d at 122. Moreover, we note the remark was brief, and the court nonetheless advised the jury that closing arguments are not evidence. See Illinois Pattern Jury Instructions, Criminal, No. 1.03 (4th ed. 2000); *People v. Williams*, 2022 IL 126918, ¶ 45 (concluding the prosecutor's comment was not substantially prejudicial, noting it was brief as it only constituted three lines in 17 pages of transcript). For these reasons, we find no error and our plain error analysis ends here.

¶ 21                          B. Ineffective Assistance of Counsel

¶ 22    Defendant argues he received ineffective assistance when his counsel failed to file a motion to sever his UPWF charge. Defendant asserts the admission of his prior conviction, which was only necessary to prove the UPWF count, unfairly portrayed him as a bad person with the

7

propensity to commit criminal acts. Therefore, he argues, no logical trial strategy existed to justify counsel's failure to move to sever the charges.

¶ 23    The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. In determining whether defendant was denied effective assistance of counsel, we apply the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on such a claim, a criminal defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). A defendant's failure to establish either prong of this test will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 24    In such claims, a defendant must overcome a strong presumption that the challenged action or inaction was the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93. Generally, defense counsel's decision not to seek the severance of a charge is a matter of trial strategy. *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10. Further, severing a charge is risky as it may give the State two bites at the proverbial apple. *Id.* For instance, an evidentiary deficiency in the first case gives the State an opportunity to cure the deficiency in the second case. *Id.* Thus, defense counsel may pursue an all-or-nothing strategy and seek acquittal on all charges during a single proceeding. *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28.

¶ 25    Here, defendant's possession of the gun, the basis for the UPWF charge, remained contested throughout the proceedings. Defendant made no admission to police as to his possession or usage of the gun, the gun was never recovered, and defendant's fingerprints were not on the shell casing found at the scene. The entirety of the State's case rested on Swearengen's testimony,

8

and as previously mentioned, defendant's trial strategy was to attack her credibility. Therefore, under these circumstances, defense counsel could have reasonably believed the odds of obtaining an acquittal on all charges were greater in one proceeding rather than two. See *People v. Logan*, 2022 IL App (3d) 190152-U, ¶ 60. Stated another way, having two separate trials could have potentially given the State the opportunity to rectify any discrepancies in Swearengen's testimony. The fact that counsel's strategy ultimately proved to be unrewarding does not mean counsel performed unreasonably. Further, we emphasize counsel ensured the jury did not hear the specifics of defendant's prior felony offense. Therefore, we conclude counsel's performance was not unreasonable, and therefore, this claim fails.

¶ 26 Defendant additionally raises issue with counsel's failure to object to numerous statements made by the prosecutor during closing arguments. However, he fails to present a proper argument before this court, and therefore, forfeited this argument on appeal.

¶ 27 Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) governs the contents of an appellant's brief and requires argument with citation to authorities and the pages of the record relied on. "The rules of procedure concerning appellate briefs are not mere suggestions[.]" *People v. Williams*, 2020 IL App (3d) 180024, ¶ 25. The purpose of these rules is to require parties to present clear and orderly arguments so a court of review can properly ascertain and dispose of the issues involved. *People v. Kraft*, 277 Ill. App. 3d 221, 224 (1995). The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned argument violates this rule (*People v. Rivera*, 2020 IL App (2d) 171002, ¶ 11), and such failures may result in forfeiture of an argument on appeal (*Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010)).

¶ 28 Defendant's brief argues remarks made by the prosecutor during closing argument were improper but fails to properly argue under the applicable *Strickland* framework, *i.e.*, how counsel's

failure to object fell below an objective standard of reasonableness, how this failure was not a matter of trial strategy, and whether there was a reasonable probability the result of the trial would have been different. While defendant's brief provides citation to authority to support his position the prosecutor's remarks were improper, his brief is devoid of any explanation or citation demonstrating counsel's failure to object constituted ineffective assistance of counsel. This is a clear violation of Rule 341(h)(7). Thus, defendant's noncompliance results in forfeiture of this issue, and we need not consider it. See *People v. Woods*, 2024 IL App (3d) 230592, ¶ 31 ("this court is not a depository into which the parties may dump the burden of argument and research").

¶ 29                           C. Constitutional Challenge

¶ 30        Last, defendant argues the UPWF statute is unconstitutional on its face in light of the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). Defendant recognizes that we previously upheld the facial constitutionality of the unlawful use of a weapon by a felon (UUWF) statute in *People v. Travis*, 2024 IL App (3d) 230113, ¶ 33.[1] However, he asserts *Travis* failed to establish a proper historical analogue for permanently disarming individuals based on criminal history.

¶ 31        We presume statutes are constitutional and must uphold their constitutionality whenever reasonably possible. *People v. Wells*, 2023 IL App (3d) 210292, ¶ 19. The challenging party bears the burden of establishing that a statute is constitutionally invalid. *People v. McKown*, 2022 IL 127683, ¶ 29. We review *de novo* the constitutionality of a statute. *Id.*

---

[1]*Travis* alternatively refers to the same singular offense codified under section 24-1.1 of the Criminal Code of 2012 (720 ILCS 5/24-1.1 (West 2022)) as UUWF. See *People v. Morales*, 2024 IL App (3d) 230433-U, ¶ 12 ("Whether the offense is labeled UUWF or UPWF is a distinction without a difference.").

10

¶ 32    A challenge to the facial constitutionality of a statute will only prevail if the challenging party demonstrates there are no set of facts which would render it valid. *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 29. The constitutionality of a statutory firearm regulation is determined using a two-part analysis that first considers (1) if the conduct at issue falls within the plain text of the second amendment and, if so, (2) whether the statute is consistent with the nation's history and tradition of firearm regulations. *Bruen*, 597 U.S. at 24. Notably, the United States Supreme Court emphasized regulations prohibiting felons from possessing firearms remain presumptively lawful post-*Bruen*. *United States v. Rahimi*, 602 U.S. 680, 699 (2024). In *Travis*, we applied *Bruen*'s two-step framework and concluded (1) the plain language of the second amendment encompasses firearm possession and felons are included as members of "the people" to whom the amendment applies, and (2) felon dispossession statutes are consistent with the country's history and tradition of disarming individuals who posed a risk of danger or criminality. *Travis*, 2024 IL App (3d) 230113, ¶¶ 25, 28-33. We continue to adopt *Travis* here.

¶ 33    Contrary to defendant's assertion, *Travis* provides a proper historical analogue for the UPWF statute that extends beyond its initial reference to the criminal disarmament proposal made during Pennsylvania's ratifying convention to include precursory restrictions such as colonial-era attainder, so-called "going armed" laws, and later federal prohibitions related to organized crime. *Id.* ¶¶ 29-30. These historical antecedents satisfy *Bruen*'s second prong as they establish a comparable tradition of dispossession from before, during, and after the nation's founding. *Bruen*, 597 U.S. at 27. For instance, in the American colonies, criminal offenses were punishable by permanent forfeiture of an offender's estate, which included firearms. *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 96. Additional colonial prohibitions for "disavowal of the rule of law" and regulations disarming those displaying an absence of allegiance during the Revolutionary War

11

period demonstrate the authority of founding-era legislatures to categorically restrict firearm possession based upon legally adverse conduct. (Internal quotation marks omitted.) *United States v. Ware*, 673 F. Supp. 3d 947, 958-59 (S.D. Ill. 2023). "[G]oing armed laws prohibited riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 697. Violators of these laws were disarmed and imprisoned for threatening public order and safety. *Id.* During the last century, the Federal Firearms Act of 1938 arose in response to an "increase in organized crime and gangster violence" and was subsequently expanded in 1961 to disarm all felons. (Internal quotation marks omitted.) *United States v. Banuelos*, 640 F. Supp. 3d 716, 723 (W.D. Tex. 2022). While not identical to the UPWF statute, this veritable lineage of predecessors establishes a comparable tradition of disarmament premised on legal disobedience. See *Bruen*, 597 U.S. at 29-30 (a proper analogue does not require a "historical *twin*," as precursory and modern-day regulations are sufficiently analogous if both "impose a comparable burden on the right of armed self-defense" that is "comparably justified" in its purpose (emphasis in original)).

¶ 34    Defendant further contends the UPWF's permanent prohibition is inconsistent with these historical regulations. However, the UPWF statute is not an inexpungible restriction as it creates an exception for those that have obtained relief under section 10 of the Firearm Owners Identification Card Act (430 ILCS 65/10 (West 2022)). See 720 ILCS 5/24-1.1(a) (West 2022). Therefore, we hold the UPWF statute is facially constitutional as it comports with a longstanding history and tradition of disarming individuals based upon criminal conduct and imposes virtually no burden on the rights of law-abiding citizens to keep and bear arms. *Travis*, 2024 IL App (3d) 230113, ¶¶ 29-31, 33.

¶ 35                          III. CONCLUSION

¶ 36        For the reasons stated, we affirm the judgment of the circuit court of Will County.

¶ 37        Affirmed.