2024 IL App (1st) 231008-U

SECOND DIVISION
September 10, 2024

No. 1-23-1008

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 02900 |
| | ) | |
| SHAQUILLE WHITEHEAD, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:    We affirm the judgment of the circuit court of Cook County convicting defendant of armed habitual criminal (AHC); the trial court did not consider facts not in evidence or abandon its role as neutral arbiter to deny defendant a fair trial; the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt; and the AHC statute is constitutional under the United States and Illinois constitutions.

¶ 2    The State charged defendant, Shaquille Whitehead, with armed habitual criminal (AHC), unlawful use of a weapon by a felon, and three counts of aggravated unlawful use of a weapon. Following a bench trial, the circuit court of Cook County found defendant guilty of AHC and UUWF. The court merged the conviction for UUWF into the conviction for AHC and sentenced defendant to six years' imprisonment for AHC. Defendant appeals the conviction on the grounds (1) the trial court denied defendant a fair trial by considering facts not in evidence and abandoning its role as neutral arbiter of the facts and adopting the role of prosecutor, (2) the State

failed to prove him guilty of every element of the offense of AHC beyond a reasonable doubt, and (3) the AHC statute is unconstitutional on its face and as applied to defendant under both the United States Constitution and Illinois Constitution.

¶ 3    For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5    The charges against defendant arose from a traffic stop of a vehicle defendant was driving with one passenger. The State called one of the officers who stopped defendant's vehicle as its only live witness at defendant's bench trial. The State also submitted into evidence footage from the testifying officer's body worn camera and the footage from the body worn camera of one of the other officers involved in the traffic stop, but the second officer did not testify.

¶ 6    Officer Axel Gallardo of the Chicago Police Department testified that on February 9, 2022, he and his partner, Officer Rojas Yesenia, conducted a traffic stop. Officer Gallardo approached the passenger side of the vehicle and his partner approached the driver's side of the vehicle. Officer Gallardo observed two people in the vehicle. He identified defendant as the driver. Defendant did not have a valid driver's license and the officers decided to tow the vehicle. At that time, defendant was already out of the vehicle. Officer Gallardo asked the passenger to exit the vehicle but the passenger did not immediately exit the vehicle. Officer Yesenia recovered a loaded handgun from the pocket of a jacket the passenger was wearing. Officers eventually removed the passenger from the vehicle and placed him into custody.

¶ 7    Officer Gallardo testified that after police placed the passenger into custody they conducted an inventory search of the vehicle. During the inventory search, police found a firearm "In the middle of the backseat on top of a child's car seat." The car seat was in the middle of the backseat of the vehicle. Officer Gallardo testified he did not see the gun immediately because

there was a blanket on top of the firearm. There was nothing else on top of the firearm other than the blanket. Officer Gallardo removed "a laundry basket, clothes, and the blanket" before he recovered the gun. The gun was loaded, it had an extended magazine, and it had a laser sight.

¶ 8       Officer Gallardo testified that at the time of the traffic stop he was wearing a body worn camera. The State published the footage of the traffic stop from Officer Gallardo's body worn camera to the trial court without objection. Officer Gallardo verbally described his actions. Officer Gallardo testified that he was searching the vehicle defendant had been driving. He removed a plastic bag containing clothes. He recovered the firearm. Officer Gallardo testified he recovered the firearm "On the child's car seat. On top of the child's car seat." He pointed out the exact area of the car seat where he recovered the firearm. The State asked that the record reflect "that the officer pointed on the car seat." The trial court asked the officer to point again and the court clarified that the officer "pointed to an area that's kind of reddish or pink on the car seat which is to the left of the white basket as one is looking at the [image.]" The court asked if the officer recovered the firearm "from the top of that which is now gray or black ***?" Officer Gallardo identified the side of the car seat. The court asked, "Where did you recover it?" The officer responded, "Where the child usually sits." The court stated, "Oh, on the seat. That's on top of where the pink or red color is?" and the officer responded, "Yes." The State stopped the recording.

¶ 9       Officer Gallardo testified that he spoke to defendant with his partner present. The officer read defendant his *Miranda* rights, after which he asked defendant who was the registered owner of the vehicle. The officer testified that defendant stated the registered owner was his sister. The officer testified that defendant also stated that "he came back from doing laundry" at the laundromat, "and he said that he had no knowledge of the firearm."

¶ 10    Upon further examination by the State, Officer Gallardo testified there were two people in the vehicle and no one was seated in the backseat. The State asked the officer to "describe how the blanket was placed over the gun." The officer testified, "It looks like the blanket was placed over the gun." The blanket was partially folded. When asked what he meant by "partially" the officer testified, "It looks like it was just thrown into the car seat ***." The firearm was within arm's reach of where defendant was seated and there was nothing else covering the firearm besides the blanket.

¶ 11    On cross-examination, Officer Gallardo testified that defendant was being cooperative with Officer Yesenia. When asked to exit the vehicle defendant did so. Officer Gallardo admitted that the passenger was also within arm's reach of the firearm recovered from the backseat of the vehicle. The passenger did not get out of the car when asked and officers eventually had to physically remove the passenger from the vehicle. Officer Gallardo agreed he had no way of knowing how long the firearm was in the car seat or how long the passenger or defendant were in the car. Officer Gallardo testified defendant told him he was coming back from doing laundry and the officer found a bag of laundry and a laundry basket in the car. The bag of laundry and the laundry basket were not on top of the firearm. Officer Gallardo had no idea how long the blanket had been there.

¶ 12    The State did not perform a redirect examination and asked that the officer be excused. The trial court asked the defense if it needed the officer to stay and the defense stated it had no objection to the officer being excused. The trial court initially excused the officer, but then stated the court had "a couple of questions of the officer." The officer retook the stand and the court asked the officer what type of handgun he found. The officer responded, "It's and FN firearm." The officer could not recall what the abbreviation "FN" meant or the caliber of the firearm. The

State refreshed the officer's memory with his case report, and the officer testified that, "It's an FN 509, nine millimeter." The court asked whether the officer recalled the type of vehicle defendant was driving. Officer Gallardo testified only that "It's a black vehicle." He refreshed his memory again and stated, "Black Chevy, ma'am;" but the officer could not recall the kind of Chevy. The trial court asked the State and the defense whether either had any questions based on the court's questions and both responded they did not.

¶ 13    The State informed the trial court it had no further live witnesses and that it would be proceeding by stipulation. The parties stipulated that the footage of Officer Rojas's body worn camera was a true and accurate depiction of the events. The trial court admitted the recording into evidence and the State published the video to the court. The court also admitted self-authenticating certified copies of defendant's two prior convictions for burglary.

¶ 14    The State rested its case and the defense moved for a directed finding. The trial court denied defendant's motion for a directed finding and the parties proceeded with closing arguments. At the conclusion of the parties' arguments the court stated it wanted "to look up some law about guns found in vehicles" and continued the matter.

¶ 15    On December 8, 2022, the trial court issued its written order following the bench trial. The court found defendant guilty of AHC and UUWF. "The State *nolle prosequi* [the remaining counts.]" The trial court's written order states, in pertinent part, that the officers stopped "a small black Chevrolet." When asked for his driver's license and insurance defendant could not produce them and said, "Coming right from the laundromat." Defendant complied with the officer's request to exit the vehicle. The court wrote: "An inventory search of the Chevrolet yielded a .9 mm handgun with a laser sight and an extended magazine, atop a child's car seat in the middle of the backseat. A blanket had been loosely covering the gun. A large white bag of clothes and a

laundry basket were immediately next to the gun." The court recounted defendant's statement to the officer about the car belonging to his sister and coming from the laundromat, then continued as follows:

> "The State argued constructive possession of the .9 mm handgun that was on top of the child's car seat was proven. Joint knowledge and control exist; the gun was within arm's reach of where defendant and the passenger had been seated. It had been put there recently, as it would have fallen from its position with a sudden stop of the vehicle. The blanket covering the gun was not random—it went with the laundry defendant admitted possessing. There were not a lot of other things in the vehicle. It would have been impossible to place the laundry where it was, and not realize a gun was on top of the car seat. *** The gun was not under a seat, in the glove box or inside a door or inside a center console or in the trunk."

¶ 16 The trial court noted that the gun was "equal distance between the driver and passenger; both were within arm's reach of it." The court acknowledged the gun was not in plain sight, it was unknown how long it had been there, this was not defendant's vehicle, and defendant "did not act suspiciously and aggressively like the passenger did." The court noted that proximity is not enough for proof beyond a reasonable doubt.

¶ 17 The court summarized the holdings in *People v. Foster*, 394 Ill. App. 3d 163 (2009), and *People v. Spears*, 2022 IL App (1st) 201290-U, and the evidence in this case. Of note is that the court stated that in *Spears*, the court found that, "If two or more persons share immediate and exclusive control or share the intention and power to exercise control, then each has possession; where possession has been shown, an inference of guilty knowledge can be drawn from the

surrounding facts and circumstances." Further, in *Spears*, the court found that "[w]here a defendant was the driver of a vehicle, and had merely a lone passenger, defendant had immediate and exclusive control of the inside of the automobile for purposes of constructive possession." Finally, the trial court here noted that in *Spears*, the court found that "a defendant's mere presence in a vehicle, without more, does not establish his knowledge of a weapon therein," but "[a]n inference of knowledge arises when the contraband is located in a place over which the defendant had regular ongoing, control and it is an item that human experience teaches is rarely, if ever, found unaccountably in such a place. A defendant's close proximity to the weapon and a description of where the weapon was found may also be considered."

¶ 18    The trial court then wrote:

"A *** weapon, a .9 mm handgun with laser sight and extended magazine, was found atop a child's car seat in the middle of the backseat, immediately next to a laundry basket and a bag of clothing, loosely covered by a blanket. The area where this weapon was recovered was easily within arm's reach of both defendant and the front seat passenger; body camera video shows the Chevrolet defendant was driving was a small vehicle. The weapon was in a location over which defendant had control and had placed laundry shortly before. The weapon was recently put atop the child's seat—such a large and distinctive handgun would not normally be left atop a child's car seat in a vehicle, certainly would have fallen upon sudden stop of the vehicle, and was loosely covered by a blanket; body cam video shows blankets were part of the laundry that was in the backseat."

¶ 19    Based on the findings stated above, the trial court found that the State proved beyond a reasonable doubt that defendant "knew the .9 mm firearm with laser sight and extended

magazine that was found in the backseat, atop the child's car seat, was in the Chevrolet. The evidence proved beyond a reasonable doubt that defendant constructively possessed that firearm."

¶ 20    Defendant filed a motion to reconsider the judgment. On May 4, 2023, the trial court denied defendant's motion to reconsider the finding of guilt in a written order.

¶ 21    On May 4, 2023, the trial court sentenced defendant. In its oral sentencing ruling, the trial court noted that the sentencing range for AHC is six to thirty years. The court noted the nature of the weapon, which it "consider[ed] to be significant." The trial court initially described the firearm as a "machine gun" but immediately corrected itself to say that "the weapon in this case was a .9 millimeter handgun loaded with a laser sight and an extended magazine." The court agreed there was no evidence defendant actually used the gun and that his prior convictions "were all burglaries, no indication of physical harm to someone else." The court also found that there "is some mitigating information in the presentence investigation in that [defendant] was cooperative with the officers as shown on the video." The court found "all of that warrants the minimum sentence here of six years in the Illinois Department of Corrections."

¶ 22    This appeal followed.

¶ 23                                    ANALYSIS

¶ 24    This is an appeal from a conviction following a bench trial attacking the fairness of the trial based on the trial court's alleged reliance on facts not contained in the record and questioning of a witness, the sufficiency of the evidence to prove defendant guilty of every element of the offense beyond a reasonable doubt, and the constitutionality of the criminal statute under which the trial court convicted defendant.

¶ 25    Our supreme court "has held that the deliberations of the trial judge are limited to the record made before [it] during the course of the trial. A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962). Although "[t]he rule is clear that when the trial court is the trier of the facts every presumption will be accorded that the judge considered only admissible evidence and disregarded inadmissible evidence in reaching his conclusion" (*Wallenberg*, 24 Ill. 2d at 354), this presumption is rebutted by statements in the record indicating the trial judge "considered matters which were not in evidence" (*id*.). Where the trial judge considered matters not in evidence, "there is no alternative but to reverse and remand for a new trial." *Id*. In these circumstances "[w]hether a defendant's due process rights have been denied is an issue of law, and thus, our review is *de novo*." *People v. Heard*, 2021 IL App (1st) 192062, ¶ 16 (the defendant argued the trial judge violated his right to due process when the judge misremembered crucial evidence).

¶ 26    Furthermore, "a trial court has discretion to *** reopen a case on its own motion where a sound basis for it appears in the record. [Citation.] The propriety of the judicial examination depends on the circumstances of each case and rests largely in the trial court's discretion. [Citation.]" *People v. Evans*, 2017 IL App (1st) 150091, ¶¶ 24-25. We review matters committed to the trial court's discretion, including matters impacting a defendant's right to a fair trial, for an abuse of discretion. See *People v. Buckner*, 376 Ill. App. 3d 251, 257-58 (2007) ("When a defendant argues that his due process rights and right to a fair trial were violated by the State's failure to disclose certain evidence in discovery, we review the trial court's ruling on the matter for an abuse of discretion."). "An abuse of discretion occurs when no reasonable person would

take the view adopted by the court. [Citations.] Moreover, the trial court's ruling will not be overturned unless the abuse of that discretion led to manifest prejudice against defendant." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 134 (citing *People v. Hudson,* 157 Ill. 2d 401, 435 (1993)).

¶ 27    "When reviewing the sufficiency of the evidence," "the relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This standard of review applies in cases whether the evidence is direct or circumstantial." *People v. Rios*, 2022 IL App (1st) 171509, ¶ 48.

¶ 28    "Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional. That presumption applies with equal force to legislative enactments that declare and define conduct constituting a crime and determine the penalties imposed for such conduct." (Internal quotation marks and citations omitted.) *People v. Smith*, 2024 IL App (1st) 221455, ¶ 9. "The constitutionality of a statute is a question of law, which is reviewed *de novo.*" *Id*.

¶ 29    For the reasons below, we find that the trial court did not deny defendant his right to a fair trial by considering facts not in evidence or briefly questioning Officer Gallardo, the evidence was sufficient to prove defendant guilty of every element of AHC beyond a reasonable doubt, and the AHC statute is constitutional under the United States Constitution and Illinois Constitution.

¶ 30                    FAIRNESS OF DEFENDANT'S TRIAL

¶ 31    First, we turn to defendant's argument the trial court deprived him of the right to a fair trial by allegedly relying on facts not in evidence and abdicating its role as a neutral arbiter of the

facts and adopting the role of a prosecutor when the trial court questioned Officer Gallardo.

Defendant argues the trial court relied on facts not in evidence to find him guilty, thereby

depriving him of his right to a fair trial. Defendant admits this issue was not properly preserved

for review and asks this court to review this issue as a matter of plain error. "To successfully

maintain a claim of either first- or second-prong plain error *** a defendant must prove actual

error." *People v. Mudd*, 2022 IL 126830, ¶ 22. That is why, "[u]nder the plain error doctrine, 'the

first step' is to determine whether any error occurred at all." *People v. Henderson*, 2017 IL App

(1st) 142259, ¶ 197.

¶ 32    Once again, "the deliberations of the trial judge are limited to the record made before

[them] during the course of the trial. A determination made by the trial judge based upon a

private investigation by the court or based upon private knowledge of the court, untested by

cross-examination, or any of the rules of evidence constitutes a denial of due process of law."

*Wallenberg*, 24 Ill. 2d at 354. Nonetheless,

> `"In a bench trial, it is the function of the trial court to determine the
>
> credibility of witnesses, weigh the evidence, draw reasonable inferences
>
> therefrom, and resolve any conflicts in the evidence. [Citation.] The trial court is
>
> 'free to accept or reject as much or as little as it pleases of a witness' testimony'
>
> [citation] and 'may take into account her own life and experience in ruling on the
>
> evidence' [citation]. ***." *People v. Petrov*, 2023 IL App (1st) 160498, ¶¶ 54-55.
>
> "A trier of fact may infer from facts and circumstances in evidence other
>
> connected facts that reasonably and usually follow according to common
>
> experience. [Citations.] A trier of fact is not required to disregard inferences that
>
> flow normally from the evidence, nor to seek all possible explanations consistent

with innocence and elevate them to reasonable doubt, nor to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt. [Citation.]" *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 35.

"We need only reverse a court's determination when the trial court's reliance on matters outside the record is prejudicial to one of the parties. [Citation.] However, '[r]eliance on information found [outside] the record is not reversible error where there is no evidence that it either misled or entered into the trial court's determination.' [Citation.] We afford a trial court every presumption that it considered only admissible evidence in reaching a conclusion. [Citation.] 'This assumption will be overcome only if the record affirmatively demonstrates the contrary, as where it is established that the court's finding rests on a private investigation of the evidence, or on other private knowledge about the facts in the case.' [Citation.]" *Petrov*, 2023 IL App (1st) 160498, ¶¶ 54-55.

¶ 33 Defendant asserts the record demonstrates the trial relied on the following specific facts which defendant claims were not in evidence:

1. The blankets were part of the laundry that was in the backseat.

2. The gun was in a location where defendant had placed laundry shortly before.

3. The handgun was found atop a child's car seat.

4. A blanket had been loosely covering the gun.

5. The handgun certainly would have fallen upon sudden stop of the vehicle.

6. The handgun was large and distinctive.

7. The car was small.

¶ 34    First, we address defendant's implication of a distinction between the trial court saying the handgun was found "atop" the car seat rather than "where the child usually sits," from which we can only infer that defendant believes the trial court found the handgun was on top of the backrest of the car seat rather than on top of the seat of the car seat, as Officer Gallardo testified. Defendant argues this allegedly inaccurate assumption by the trial court led the trial court to conclude the handgun would have fallen from the car seat upon a sudden stop. These arguments fail.

¶ 35    Defendant offers no evidence that is what the trial court meant other than his own characterization of what "atop" means. We reject defendant's characterization as refuted by the record. The State's statement for the record about where the handgun was found was admittedly vague. The trial court questioned Officer Gallardo itself to clarify his testimony. It was in response to the trial court's questioning that Officer Gallardo testified the gun was found "where the child usually sits." The record, rather than establishing that the trial court relied on a fact not in evidence, establishes that the trial court was keenly interested in and consciously aware of the exact location where the gun was recovered.

¶ 36    Next, defendant also argues the State offered no evidence of what was or was not a part of defendant's laundry, and the trial court's speculation led the court to conclude the handgun was in a place where defendant had just placed laundry and therefore he must have seen it. Defendant argues the officer never testified the blanket was "loosely" covering the handgun. Defendant argues the conclusion the blanket "loosely" covered the handgun is belied by the recording from Officer Gallardo's body worn camera which shows the officer "pulling hard" on the blanket to remove it. Defendant separately argues the State "never established that a gun placed on the seat 'where the child usually sits' and covered by a blanket would have fallen

anywhere upon a sudden stop of the vehicle, or that the gun must have been placed on the seat recently."

¶ 37    Defendant argues these facts, which allegedly are not part of the record, led the trial court to reason that because the gun had not fallen then it must have been put there only recently, and if it were put there recently it must have been put there by defendant, which, defendant argues, led to the court's determination that the State proved that defendant "had knowledge of the gun." Defendant also argues the State offered no evidence of the size of the handgun or of the car, yet the trial court relied on the fact the gun was "large and distinctive" and the car was "small" to find him guilty. Defendant argues that the trial court's assumption of a fact not in evidence about the size of the car permitted the court to find the State proved the handgun was in arm's reach and, therefore, that defendant constructively possessed the gun. Defendant does not explicitly argue, as he did with the other alleged facts not in evidence, how the trial court's alleged adoption of the fact of the size and distinctiveness of the handgun influenced its decision and prejudiced him.

¶ 38    The State responds the evidence adduced at trial supported the reasonable inferences that defendant had recently placed the laundry in the car and that the blanket was part of the laundry. The State points to evidence that defendant stated he was coming from the laundromat and the proximity of the blanket to the laundry basket and bag of clothes as supporting the inferences that the blanket was part of the laundry and had recently been placed in the car. The State argues the recording from the officer's body worn camera shows the size of the car and the trial court expressly based its finding about the size of the car on the video.

¶ 39    The State also argues the recording shows the size and shape of the handgun and, further, that the officer testified that the handgun was a .9 mm caliber with a laser sight and distinctive

magazine, both of which support the trial court's finding that the gun was large and distinctive. The State points to the officer's testimony that it appeared the blanket had been thrown into the seat, and the depiction of the area in the recording, as supporting the inferences that the blanket "loosely" covered the gun and that the gun would have fallen off the seat in the event of a sudden stop. The State argues it was for the trial court to decide what the fact the officer had to "pull hard" on the blanket meant and that the court could have decided it just meant the blanket was large.

¶ 40     In reply, defendant offers his own interpretation of what the same facts noted by the State mean, positing counter-inferences and what defendant believes to be "the most likely scenario." Defendant argues the size of the blanket supports his argument the gun was completely concealed and, therefore, he did not know it was present. Defendant simply denies that it can be inferred from the "fact that a small portion of the blanket hung very slightly over the bag of laundry" (a fact the trial court did not rely on) that defendant placed the blanket in the car and over the gun.

¶ 41     We find that the trial court did not make any determinations based upon information not in the record. *Wallenberg*, 24 Ill. 2d at 354. Rather, the trial court properly weighed the evidence and drew reasonable inferences therefrom. Moreover, the trial court was free to accept Officer Gallardo's admissible testimony about the blanket and properly took into account its own life and experience in ruling on the evidence. *Petrov*, 2023 IL App (1st) 160498, ¶¶ 54-55. This record does not affirmatively demonstrate the contrary. *Id*. Defendant's arguments are largely based on inferences consistent with innocence rather than guilt. The trial court was not "required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt." *Sherman*, 2020 IL

App (1st) 172162, ¶ 35. Finally, defendant complains the trial court's judgment is based on "a string of inferences." This assertion does not lead to the conclusion that the evidence is so improbable or unsatisfactory to create a reasonable doubt of defendant's guilt. *Spears*, 2024 IL App (1st) 181491, ¶ 194 ("We will not reverse the *** verdict for lack of evidence unless the evidence is 'so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt.' [Citation.]"). "The State has the burden of establishing each element of the offense beyond a reasonable doubt. However, this burden does not require that the State demonstrate every link in the chain; rather the court can rely upon the reasonable inferences which arise from circumstantial evidence." *People v. Lynch*, 241 Ill. App. 3d 986, 992 (1993). And, "a criminal conviction 'may be based solely on circumstantial evidence.' [Citation.]" *People v. Mallett*, 2023 IL App (1st) 220920, ¶ 62.

¶ 42 The finding that "[t]he blanket covering the gun *** went with the laundry defendant admitted possessing" is a reasonable inference from defendant's own admission he was just coming from the laundromat, the nature of the item itself—which defendant admits was a large blanket—and its proximity to other items that defendant does not dispute were part of the laundry he had just done—specifically the laundry basket and bag of clothes. The trial court noted another fact—one which defendant does not dispute—that supports the inference that the blanket was part of defendant's laundry: "There were not a lot of other things in the vehicle." If the vehicle was primarily carrying what defendant does not dispute was laundry it stands to reason the blanket was also laundry. Similarly, the finding that the blanket "had been put there recently" is supported by defendant's admission he was just coming from the laundromat and the reasonable inference from the facts and circumstances that the blanket was part of that laundry.

¶ 43    Furthermore, Officer Gallardo testified about the blanket that, "It looks like it was just thrown into the car seat." That, and the trial court's own observations, are sufficient to reasonably infer that "[a] blanket had been loosely covering the gun." One may reasonably infer from common experience that a "partially folded" blanket that is "just thrown over" a car seat, as Officer Gallardo testified, as opposed to being pressed down or tucked in, would rest loosely over the car seat. One may also infer from common experience that regardless how large or heavy a blanket is, if it is just "thrown over" a car seat it would not press down on an object on the seat portion of the car seat of its own weight. Similarly here, because it is reasonable to infer that the blanket sat "loosely" over the car seat, a heavy object like a firearm (one may reasonably infer the approximate mass of a handgun) could fall upon a sudden stop of the vehicle. In this instance, however, whether that inference is reasonable from the evidence or not, we find defendant was not prejudiced by it and, therefore, reversal is not required. *Petrov*, 2023 IL App (1st) 160498, ¶¶ 54-55. Defendant argues the trial court used this inference to infer the handgun had been placed there recently—because it had not fallen—and because it had been placed there recently, defendant knew about it. We disagree. Although the trial court did find that "[i]t had been placed there recently, as it would have fallen from its position with a sudden stop of the vehicle," this was not the trial court's reason for finding defendant knew the gun was in the car within his reach. The trial court wrote, "It would have been impossible to place the laundry where it was, and not realize a gun was on top of the car seat."

¶ 44    We find the trial court found knowledge based on the findings (both from the evidence and reasonable inferences therefrom) that the handgun would have been visible on the seat of the car seat before laundry was placed in the car, the blanket was part of the laundry, and defendant placed the laundry—thereby covering the handgun—in the car recently, as he was just coming

from the laundromat. Finally, the trial court saw the gun, heard a description of the gun, and saw the car. These facts are undisputed. The trial court's conclusions about the size of the handgun and the car were not based on facts not in evidence but on what it heard and saw.

¶ 45    The trial court did not base its judgment on facts not in evidence. "Finding no error on this contention, we find no plain error or ineffectiveness of counsel." *People v. Collins*, 2021 IL App (1st) 180768, ¶ 38. Defendant's argument he was denied a fair trial on this basis fails.

¶ 46    Next, defendant argues the trial court "crossed the line between trier of fact and advocate for the State" when the court questioned Officer Gallardo.

> "A criminal defendant who elects to be tried in a bench trial is entitled to the same fair, patient, and impartial consideration he would be entitled to by a jury composed of fair, impartial, careful and considerate jurors. [Citation.] *** A trial judge's questioning of a witness must be done in a fair and impartial manner, without showing bias or prejudice against either party. [Citation.]" (Internal quotation marks omitted.) *People v. Wesley,* 18 Ill. 2d 138, 155 (1959).

¶ 47    This court has explained the trial court's role in this context: "The trial court has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure." *Wesley*, 18 Ill. 2d at 155. Further,

> "Illinois courts have recognized that the proper function of a judge includes a duty to ensure that justice is done in criminal trials when, for instance, a certain fact has not been developed or a certain line of inquiry has not been pursued, as long as the judge does not in any way become an advocate for one side or the other. [Citations.]

>          To this end, a trial court may, *sua sponte*, call its own witnesses and
> question witnesses called by either party. [Citation.] What a trial court may not do
> is assume the role of an advocate. [Citation.] But, a suggestion that the State
> present evidence proving essential elements of an offense is not an assumption of
> the role of a prosecutor. [Citation.]" *People v. Evans*, 2017 IL App (1st) 150091,
> ¶¶ 24-25 (citing, *inter alia*, *People v. Lurie*, 276 Ill. 630, 641 (1917)).

Moreover, "[i]n a bench trial, it is the function of the trial court to determine the credibility of witnesses [and] weigh the evidence ***. The trial court is 'free to accept or reject as much or as little as it pleases of a witness' testimony.' [Citation.]" *Petrov*, 2023 IL App (1st) 160498, ¶¶ 54-55.

¶ 48    Defendant also cites *Lurie* and argues there was no evidence "that a fact had not been developed or a line of inquiry not pursued" to permit the trial court to interpose, and the court assumed the role of advocate when the court questioned Officer Gallardo and "used Gallardo's answers to support the State's case." Defendant argues that the court assumed the function of advocate and favored the State because the court used facts obtained from its own questioning to find defendant guilty—specifically, the caliber of the handgun and the size of the car. Defendant argues that evidence of the fact the trial court assumed the role of prosecutor lies in the fact that Officer Gallardo could only describe the car as a black Chevy but the court repeatedly described the car as "small." Defendant argues the trial court used the size of the car to find the gun was within defendant's reach. Defendant does not specify how the caliber of the gun entered into the court's decision making and only notes that the court found the gun to be "large and distinctive" based the court's own questioning of Gallardo.

¶ 49     We find that the trial court "did not abandon its role as neutral arbiter and assume the role of a prosecutor." *Evans*, 2017 IL App (1st) 150091, ¶ 26. The trial court's questioning was not extensive. *Wesley,* 18 Ill. 2d at 155 ("A trial judge's questioning 'should rarely be extensive,' although an 'extensive examination may be justified if the court has reason to believe that a witness is not telling the truth.' "). We disagree with defendant's claim that there was no fact that had not been developed when the trial court questioned Gallardo. The exact location where the gun was recovered had not been developed when the court asked Gallardo, "Where did you recover it?" The location of the gun was clearly an important fact that needed to be developed. "And, as this was a bench trial, the court possessed wide latitude, the question related to its fact-finding role, and the risk of prejudice to [defendant] was low." *Evans*, 2017 IL App (1st) 150091, ¶ 26 (holding trial court did not abandon its role as neutral arbiter). The risk of prejudice to defendant from the question itself was low because the answer may have helped defendant. (For example, if Officer Gallardo *had* testified the gun was on top of the backrest defendant might have used that testimony to argue the gun was not in his reach—although we express no opinion about the efficacy of that argument.)

¶ 50     "To show prejudice in a bench trial, the defendant must show that 'the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence.' [Citation.]" *People v. Jackson*, 409 Ill. App. 3d 631, 646-47 (2011). There is nothing to indicate the trial court had prejudged the outcome. The question was a direct request for a relevant fact, the answer to which may have benefitted either party. In fact, defendant uses his own interpretation of the evidence of the location of the gun to bolster his argument the trial court's findings are not supported by evidence in the record. We find that this question was asked "in a fair and impartial manner, without in any way showing bias for or prejudice against

either party to the litigation." *Lurie*, 276 Ill. at 640. Furthermore, in this case, like in *Evans*, the trial court "did not decide *** that the State needed to present more evidence and then order the State to produce it. Rather, the trial court [elicited] evidence before argument." *Id*. ¶ 30. Therefore, in this case, the questioning was a "proper function of a judge." *Evans*, 2017 IL App (1st) 150091, ¶ 24 (citing , *inter alia*, *Lurie*, 276 Ill. at 641).

¶ 51    Nor had the type of gun and car been developed when the trial court recalled Officer Gallardo to the stand. Regardless, the trial court's questioning about the caliber of the gun and the type of car were "not necessary to prove the State's case." *Id*. ¶ 30. For whatever purpose it may or may not have been used, the *State* elicited sufficient evidence for the trial court to find the handgun was "large and distinctive." The State asked Officer Gallardo, referring to the handgun, "What attachments did it have?" Officer Gallardo responded, "It has an extended magazine and a laser sight." That evidence elicited by the State is sufficient to permit the trial court to find the gun "large" (it had an extended magazine) and "distinctive" (it had a laser sight). As for the size of the car, any testimony elicited by the trial court touching on the size of the car was not necessary to prove whether the gun was within defendant's reach. The State asked, "Was the firearm within arm's reach of where the defendant had been seated?" Officer Gallardo responded, "Yes."

¶ 52    Defendant has failed to establish prejudice from the trial court's questioning of Officer Gallardo. We find the trial court did not abuse its discretion.

¶ 53                    SUFFICIENCY OF THE EVIDENCE

¶ 54    Defendant argues the State failed to prove beyond a reasonable doubt that defendant had constructive possession of the handgun. "To prove [defendant] guilty of armed habitual criminal, the State had to show two elements: (i) [defendant] possessed a firearm and (ii) possession was

after having been convicted of two qualifying offenses." *People v. Hudson*, 2023 IL App (1st) 192519, ¶ 45. Defendant only disputes whether the State proved possession. In the absence of actual possession, the State must seek "to prove constructive possession—that [defendant] had knowledge of the gun's presence and 'immediate and exclusive' control over the area where officers found it. [Citation.]" *Id.*, *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17 ("When a defendant is not found in actual possession, the State must prove constructive possession."). Defendant argues the State failed to prove that defendant constructively possessed the handgun because the gun was not visible, defendant did not make any gestures or movements toward the backseat of the car, no physical evidence links him to the handgun, and defendant made no incriminating statements.

¶ 55    "A person has actual possession when he has immediate and exclusive control over an item; actual possession does not require 'present personal touching' of that item. [Citation.] A person has constructive possession when he lacks actual possession but has the intent and capability to exercise control over the item. [Citation.]" *People v. Davis*, 2023 IL App (1st) 231856, ¶ 22. "The control may be exercised directly or through another person. [Citations.] '[I]f two or more persons share [the] immediate and exclusive control or share the intention and [the] power to exercise control' over a thing, 'then each [one] has possession.' [Citation.]" *People v. Williams*, 2020 IL App (1st) 163417, ¶ 66.

¶ 56    "[I]t is not the function of the reviewing court to retry the defendant. [Citation.] *** The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. [Citation.]" *Rios*, 2022 IL App (1st) 171509, ¶ 48. "We have recognized that constructive possession often involves

'entirely circumstantial' evidence [citation]." *Hudson*, 2023 IL App (1st) 192519. ¶ 45. Circumstantial evidence is sufficient to sustain a criminal conviction. *Id*. ¶ 49.

> "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. [Citation.] The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances; it is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. [Citation.] To prove guilt beyond a reasonable doubt does not mean that a [trier of fact] must disregard the inferences that flow normally from the evidence before it." *Rios*, 2022 IL App (1st) 171509, ¶ 49.

Nor is the trier of fact "required to *** seek all possible explanations consistent with innocence and elevate them to reasonable doubt. [Citation.] In other words, the State need not disprove or rule out all possible factual scenarios in order to sustain its burden." *People v. Hines*, 2021 IL App (1st) 191378, ¶ 36. "We will not reverse the *** verdict for lack of evidence unless the evidence is 'so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt.' [Citation.]" *Spears*, 2024 IL App (1st) 181491, ¶ 194.

¶ 57　In his opening brief, defendant did not make any specific arguments that the State failed to prove he had "immediate and exclusive control over the area where the firearm is found." Although the State does not argue forfeiture, the State does assert, repeatedly, that defendant is not challenging the "control" factor for constructive possession. Defendant refutes this contention, arguing in reply that he did argue the State failed to prove "control" because defendant challenged the sufficiency of the evidence to prove constructive possession in general,

and defendant cited cases in which the court found a lack of "control." The State is correct that defendant's opening brief did not argue that the State failed to prove defendant had control over the area where the firearm is found.

> "Arguments raised for the first time in a reply brief need not be addressed by this court. [Citation.] Besides maintaining consistency and uniformity, avoiding confusion, and preventing gamesmanship, Rule 341(h)(7) prevents unfairness to an adverse party who would have no notice of the issue or an opportunity to provide a response. [Where an] issue could have been raised in the principle brief but was not, we decline to entertain it." *People v. Pittman*, 2014 IL App (1st) 123499, ¶ 38 (citing Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013)).

¶ 58    Although the issue of control is not properly before this court, we find defendant's newly raised arguments that the State failed to prove control unpersuasive.[1]

¶ 59    Defendant argues the State failed to prove control because he did not own the vehicle and "his status as the driver did not establish his possession of the entire contents of the vehicle." "[W]e agree with *** defendant that ownership is not *dispositive*," but [it] may be relevant or "probative of the issue of control." *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 32. Ownership is not a necessary element of control for purposes of constructive possession and plays no part in this case. However, "direct evidence of a defendant driving a vehicle is surely sufficient evidence of control." *Bogan*, 2017 IL App (3d) 150156 ¶ 42. Defendant's new argument the State failed to prove the "control" element of constructive possession fails. Defendant is correct only in that

---

[1]    See *People v. Berg*, 39 Ill. App. 3d 455, 457 (1976) (where the State raised the issue of abandonment for the first time in its reply brief, the court found the issue was not properly before the court but, nonetheless found the State failed to carry its burden of proving the incriminating property was abandoned), vacated on other grounds, *People v. Berg*, 67 Ill. 2d 65 (1977).

"his status as the driver did not establish his [*knowing*] possession of the entire contents of the vehicle."

¶ 60 "[K]nowledge may often be inferred from one's control over an area. [Citation.] Such an inference is certainly not always appropriate." *Bogan*, 2017 IL App (3d) 150156, ¶ 45. "While *any sort of control* will satisfy the first component of constructive possession, *** only 'regular, ongoing control' may give rise to an inference of knowledge." (Emphasis added.) *Id*. In the absence of "regular, ongoing control" the State must present other evidence of knowledge, which may include "circumstantial evidence from which [the] defendant's knowledge could be inferred." *Hampton*, 358 Ill. App. 3d at 1033. The State does not have to prove the handgun was in plain view at all times, as long as defendant had an opportunity to observe it. See *People v. Bailey*, 333 Ill. App. 3d 888, 892 (2002). For the reasons stated below, we find the State did present evidence of knowledge other than defendant's status as the driver.

¶ 61 Defendant also argues that the trial court misplaced its reliance on *Spears*, 2022 IL App (1st) 201290-U, because *Spears* is distinguishable in that, in *Spears*, the defendant was alone in the car, fled from police, and the gun was hidden in a way that called attention to its presence. In *Spears*, the court found that the defendant had control of the vehicle because the defendant "was its driver and sole occupant." *Spears*, 2022 IL App (1st) 201290-U, ¶ 35. It is clear from *Spears* that it did not only rely on the fact the defendant was alone in the car but instead, the fact the defendant was alone in the car was just additional "evidence for a rational trier of fact to find that [the] defendant controlled the vehicle from which the contraband was discovered." *Id*. This conclusion is proven by the *Spears*' court citation in support of this finding to *People v. McNeely*, 99 Ill. App. 3d 1021, 1023-24 (1985), for the proposition that " 'because the defendant was the driver of the vehicle, *and because he had merely a lone passenger*, defendant had

immediate and exclusive control of the inside of the automobile' for purposes of constructive possession of methaqualone recovered from under the front passenger's seat" (emphasis added), and *People v. Janis*, 56 Ill. App. 3d 160, 163-65 (1977) ("The defendant had immediate and exclusive control over the area in which the officer found the gun. The presence of the other men in the car does not negate defendant's constructive possession of the concealed weapon.") *Spears*, 2022 IL App (1st) 201290-U, ¶ 35.

¶ 62 Additionally, the fact the defendant in *Spears* fled was a relevant, but not a necessary, fact in support of the inference of the defendant's knowledge of the presence of the handgun. See *id*. ¶ 29 (introducing evidence of defendant's flight, along with other evidence, by stating "[a]lso supporting the inference of defendant's knowledge"). The *Spears* court did rely, in part, on the fact that after manipulating "the compartment containing the firearm, [it was] *immediately visible*" and "was located so close to the driver's area and was readily accessible upon 'manipulation' [to] suggest the firearm was intentionally placed there to be readily accessible to the driver" to find that the evidence was sufficient to prove the defendant knew the firearm was in the vehicle. *Id*. ¶ 38. Nothing in *Spears* suggests that its factual determinations are necessary factors to find knowledge of the presence of contraband. The *Spears* court merely applied the facts of the case before it to the question of whether "the contraband [was] located in a place over which the defendant had 'regular ongoing control' and [was] 'an item that human experience teaches is rarely, if ever, found unaccountably in such a place.' [Citation.]" (*id*. ¶ 37) to find that defendant knew the firearm was in the vehicle. The facts of this case satisfy those standards. Defendant's attempt to distinguish *Spears* is unavailing.

¶ 63 Turning to the question of defendant's knowledge, and control, in *Bailey*, 333 Ill. App. 3d 888, a jury found the defendant guilty of aggravated unlawful use of a weapon where the

defendant was a passenger in a car and after an inventory search of the car police recovered a handgun beneath the defendant's seat. *Bailey*, 333 Ill. App. 3d at 890. Before trial, the defendant alternatively told police the driver of the vehicle had shown the defendant the gun in the defendant's residence, after which the defendant placed the gun on a table, and that the driver had shown the defendant the gun in the car after which the defendant returned it and exited the car. *Id*. At trial, the defendant testified he had no knowledge of the gun in the vehicle and denied making any statements about the driver showing the defendant the gun. *Id*.

¶ 64    The defendant in *Bailey* argued that the State failed to prove the defendant had knowledge of the gun in the vehicle. *Id*. at 891. The court held that it was incumbent on the State to present *some* circumstantial evidence of knowledge of the presence of the weapon. *Id*. at 891. The court stated that "[a] defendant's mere presence in a car, without more, is not evidence that he knows a weapon is in the car." *Id*. at 891 (citing *People v. Davis*, 50 Ill. App. 3d 163, 168 (1977)). The court found that some factors from which knowledge could be inferred include "(1) the visibility of the weapon from defendant's position in the car, (2) the period of time in which the defendant had an opportunity to observe the weapon, (3) any gestures by the defendant indicating an effort to retrieve or hide the weapon, and (4) the size of the weapon." *Id*. at 891-92. But the *Bailey* court also found that "[c]ourts should also consider any other relevant circumstantial evidence of knowledge, including whether the defendant had a possessory or ownership interest in the weapon or in the automobile in which the weapon was found." *Id*. at 892 (citing *Davis*, 50 Ill. App. 3d at 168). In *Bailey*, the State "failed to introduce any evidence that [the defendant] had knowledge of the weapon's presence in the vehicle in which the defendant was the passenger." *Id*. at 892.

¶ 65    Subsequently, in *People v. Robinson*, the defendant argued that "his conviction must be reversed where there was nothing connecting him to [drugs recovered from 'the pouch behind the driver's seat of the car in which he was a passenger'] aside from his mere presence in the car, which [the defendant] maintains is insufficient as a matter of law." *People v. Robinson*, 2024 IL App (1st) 230232-U, ¶ 36. The *Robinson* court found that "[w]hen there is no direct evidence of knowledge of contraband in a car, reviewing courts look to four factors, derived from *People v. Davis*, 50 Ill. App. 3d 163 (1977), and cited in *People v. Bailey*, 333 Ill. App. 3d 888 (2002), to determine whether the State presented sufficient circumstantial evidence from which the defendant's knowledge may reasonably be inferred." *Id*. ¶ 39. The court listed the "*Bailey* factors" and further stated that the "State cannot rely on a defendant's mere presence to establish knowledge that a controlled substance is in a vehicle." *Id*. (citing *People v. Horn*, 2021 IL App (2d) 190190, ¶ 40, *People v. Ingram*, 389 Ill. App. 3d 897, 900 (2009)). The *Robinson* court, relying exclusively on the "*Bailey* factors," found that the State "failed to present sufficient evidence that [the] defendant had knowledge of the presence of the bag of drugs as to establish constructive possession." *Id*. ¶ 44 ("Having considered the *Bailey* factors, we conclude that in this case, the State failed to present sufficient evidence that defendant had knowledge of the presence of the bag of drugs so as to establish constructive possession.").

¶ 66    In this case, defendant argues that applying the "*Bailey* factors" to this case "demonstrates that the State failed to prove that [defendant] knowingly possessed the gun the police recovered from the back seat of [defendant's] sister's car. Defendant argues (1) the handgun was not visible to defendant—and in support thereof defendant argues the State failed to prove the blanket covering the gun was part of defendant's laundry; (2) there is no evidence as to how long the gun was in the car and therefore no evidence that defendant had any opportunity

to observe the handgun; (3) there was no evidence of defendant attempting to retrieve or hide the handgun, nor that defendant made any furtive movements toward the back seat; (4) the size of the gun—" 'small' enough to sit on the child's car seat completely out of sight—does not support the conclusion that [defendant] was aware of its presence;" and (5) any additional factors of knowledge do not support his conviction where (i) there is a lack of physical evidence tying defendant to the handgun, (ii) defendant did not try to flee, and (iii) defendant cooperated with police and never made an admission of guilt or otherwise display a guilty conscious. Defendant argues that under *Bailey*, his mere presence in the car, which he argues is the only fact the State proved, is not enough to prove knowledge. Defendant concludes "the State failed to establish constructive possession beyond a reasonable doubt," and this court should reverse defendant's AHC conviction outright.

¶ 67     The State responds defendant's status as the driver, time in the car, and the location and size of the handgun prove defendant had knowledge and control of the firearm. The State argues that defendant was not "merely present" in the vehicle but was the driver, as the driver defendant had control over the vehicle's contents, and that control raised the reasonable inference defendant had knowledge of the firearm notwithstanding the passenger's access to the firearm. The State also argues that defendant had control over the firearm because defendant was the driver and because of the location of the handgun—within arm's reach where "firearms are not normally found." The State argues that defendant's control "over the vehicle's contents generates a reasonable inference of his knowing possession of the weapon." The State disputes defendant's analysis of the *Bailey* factors, arguing (regarding the first factor) that the evidence raises a reasonable inference that the blanket covering the handgun was part of the laundry defendant moved in and out of the vehicle, and the firearm, which was easily identifiable as such, would

have either been visible when defendant placed the blanket over it or that defendant placed it there himself. As to the remaining factors, the State argues it did not have to elicit evidence as to every factor to establish defendant's constructive possession of the handgun because "*Bailey*'s list is not exhaustive, and a finding of knowledge does not require that every factor on the list be met." Rather, the State argues, the circumstantial evidence "all supported the [trial] court's guilty verdict."

¶ 68    First, we agree with the State that it was not required to produce evidence of every "*Bailey* factor" to prove defendant constructively possessed the handgun. As the State notes, even the *Bailey* court stated that "[c]ourts should also consider any other relevant circumstantial evidence of knowledge ***." *Bailey*, 333 Ill. App. 3d at 892. This court has recognized that "[t]he *Bailey* factors do not *** constitute the *exclusive* means for determining whether a vehicle occupant knew that contraband was present" ((emphasis in original) *Spears*, 2022 IL App (1st) 201290-U, ¶ 45, see also *People v. Davis*, 2016 IL App (1st) 141787-U, ¶ 19 ("[t]he court's list of factors was not exclusive")), and that we are not required to apply them in every case (see *People v. Silva*, 2015 IL App (1st) 140695-U, ¶ 19 ("the [*Bailey*] court's list of factors was not exclusive. [Citation.] Given the different circumstances in the current case, we believe the factors considered in *Bailey* are less relevant here.")). The foregoing notwithstanding, "the period of time in which [defendant] had an opportunity to observe the weapon" (*Bailey*, 333 Ill. App. 3d at 892 (listing factors)) weighs in favor of inferring that defendant had knowledge of the handgun. The evidence was sufficient to produce reasonable inferences that defendant placed the blanket in the car, and thus over the handgun visible on the seat of the car seat, as part of the laundry defendant admitted he had just done. A reasonable trier of fact could infer defendant had the opportunity to observe the weapon when putting the laundry in the car to go to the laundromat,

taking it out to do the laundry, and a third time putting the laundry back in the car. Any would have provided an opportunity to observe the handgun on the car seat.

¶ 69    Second, while defendant is correct that his "mere presence" in the vehicle, alone, is insufficient to establish his *knowledge* of the presence of the firearm (*People v. Cook*, 2021 IL App (3d) 190243, ¶ 25 ("A defendant's mere presence in a car, without more, is not evidence that he knows a weapon is in the car.")), it is also true that defendant's status as the driver is sufficient to establish that defendant had immediate and exclusive *control* over the area where the weapon was found (uncased, covered by a blanket, on the seat of a car seat, in the middle of the backseat of the vehicle defendant was driving). *Bogan*, 2017 IL App (3d) 150156, ¶ 42 ("direct evidence of a defendant driving a vehicle is surely sufficient evidence of control"), see also *People v. White*, 2024 IL App (1st) 221373-U, ¶ 28 (quoting *Bogan*). And "[p]roof that a defendant had control over the premises where the contraband is found gives rise to an inference of knowledge and possession of that contraband" (*Jackson*, 2019 IL App (1st) 161745, ¶ 27).

¶ 70    In *Hampton*, the court held that for an inference to arise that the defendant had knowledge of a handgun within the vehicle's glove compartment, "the State had to demonstrate that [the] defendant had regular, ongoing control over the vehicle that he was driving." *People v. Hampton*, 358 Ill. App. 3d 1029, 1032 (2005). Alternatively, the State must adduce "other evidence establishing knowledge of the weapon" which may include circumstantial evidence. *People v. Ingram*, 389 Ill. App. 3d 897, 900 (2009) ("knowledge may, and most often must, be proved by circumstantial evidence."). There was no evidence and we do not find that defendant had "regular, ongoing control" of the vehicle, but the handgun, even covered by the blanket, was "an item that human experience teaches is rarely, if ever, found unaccountably in such a place." *Hampton*, 358 Ill. App. 3d at 1032. Nonetheless, the evidence established more than defendant's

"mere presence in the vehicle." The State adduced additional circumstantial evidence of defendant's knowledge of the handgun.

¶ 71     The handgun was found in the middle of the backseat on the seat portion of the car seat and would have been in plain view if it were not covered by the blanket; and as previously discussed, the evidence permitted the reasonable inference that the blanket found covering the handgun was part of the laundry, that defendant placed the laundry in the car either before or after leaving the laundromat, and that defendant would have seen the handgun on the car seat when defendant put the laundry in the car (or, as Officer Gallardo testified, tossed the blanket over the car seat). We do not need to find that defendant put the handgun on the car seat or that defendant intentionally tried to hide the gun with the blanket (although both are reasonable inferences from the evidence). All that is required to establish defendant's constructive possession of the handgun is that defendant "had knowledge of the presence of the contraband, and had control over the area where the contraband was found." *Bogan*, 2017 IL App (3d) 150156, ¶ 27 (citing *People v. Hunter*, 2013 IL 114100, ¶ 19, *Hampton*, 358 Ill. App. 3d at 1031). It is also irrelevant that defendant's passenger had an equal ability to exercise control over the firearm or may have also known of its presence. "Constructive possession is not diminished by evidence of others' access to contraband." *Jackson*, 2019 IL App (1st) 161745, ¶ 27. It is "settled law that constructive possession of contraband can be established even where possession is joint or others have access to the area where the contraband is recovered." *People v. Maldonado*, 2015 IL App (1st) 131874, ¶ 43. The State proved that defendant had immediate and exclusive control over the area where officers found the handgun and knowledge of the gun's presence in the vehicle. *Hudson*, 2023 IL App (1st) 192519, ¶ 45, *Spencer*, 2012 IL App (1st) 102094, ¶ 17.  The evidence admitted at trial and the reasonable inferences therefrom were

sufficient to permit the trier of fact to find beyond a reasonable doubt that defendant constructively possessed the handgun.

¶ 72    CONSTITUTIONALITY OF AHC UNDER THE SECOND AMENDMENT

¶ 73    Defendant argues the AHC statute is unconstitutional on its face and as applied to defendant because it violates the second amendment to the United State Constitution. A facial challenge requires a showing that the statute in question is unconstitutional under any set of facts. *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 12. A conviction based on a facially unconstitutional statute is void (*In re N.G.*, 2018 IL 121939, ¶ 67), and the issue of the constitutionality of the statute may be raised by a defendant for the first time on appeal (*People v. Neely*, 2013 IL App (1st) 120043, ¶ 8).

¶ 74    "[A]n as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *Kelley*, 2024 IL App (1st) 230569, ¶ 12. "A facial challenge fails if we can conceive of any set of circumstances in which the statute could be validly applied—including as applied to the very party before us." *In re Jawan S.*, 2018 IL App (1st) 172955, ¶ 48 (citing *People v. Garvin*, 219 Ill. 2d 104, 125 (2006) ("if as-applied challenge fails, facial challenge necessarily fails")).

"Because facial and as-applied constitutional challenges are distinct actions, it is not unreasonable to treat the two types of challenges differently ***. By definition, an as-applied constitutional challenge is dependent on the particular circumstances and facts of the individual defendant or petitioner. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Holman*, 2017 IL

120655, ¶¶ 29-30, *overruled on other grounds by People v. Wilson*, 2023 IL
127666, ¶ 42.

¶ 75    In *Travis*, the court held that it could review an as applied challenge on appeal if the
record was sufficiently developed. The court found that the "[d]efendant concedes he did not
raise the issue previously but argues the record is sufficiently developed for us to review his
claim, and upon review of the record, we agree. See *Holman*, 2017 IL 120655, ¶¶ 29-32,
*overruled on other grounds by Wilson*, 2023 IL 127666, ¶ 42 (finding where all relevant facts
and circumstances are contained in the record, a claim may be raised and reviewed on appeal)."
*People v. Travis*, 2024 IL App (3d) 230113, ¶ 17. Similarly, here, defendant's criminal history is
undisputed and it is unclear how further investigation into whether defendant is a "violent" felon
"would aid us in determining whether the felon dispossession statutes have been constitutionally
applied to defendant" where the second amendment, article I, section 22, nor the AHC statute
draw any distinction between "violent" felonies and "nonviolent" felonies. See *id*. ¶ 18.

¶ 76    Although the State argues defendant forfeited his as-applied challenge by failing to raise
it in the trial court, we find that the record is sufficiently developed for this court to address the
challenge. *Id*. ¶ 17. Therefore, we begin with defendant's as-applied challenge because if the
statute is constitutional as applied to defendant then there is necessarily a set of facts under
which the statute is constitutional. See *People v. Muhammad*, 2023 IL App (1st) 230121-U, ¶ 14.

¶ 77    Defendant argues the AHC statute violates the second amendment under the test
announced by the United States Supreme Court in *New York Rifle & Pistol Ass'n, Inc., v. Bruen*,
597 U.S. 1 (2022). In *Bruen*, the Supreme Court announced a two-part test to determine whether
statutes that regulate the right to keep and bear arms violate the second amendment. *Bruen*, 597
U.S. at 24. Post-*Bruen*, "the standard for applying the Second Amendment is as follows: When

the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* To determine whether a regulation is "consistent with the Nation's historical tradition of firearm regulation,"

> "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' [Citation.] ***
>
> Why and how the regulation burdens the right are central to this inquiry. [Citation.] For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.' [Citation.] The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.' [Citation.]" *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (explaining *Bruen*).

¶ 78 The first step of the *Bruen* test, whether the second amendment's "plain text covers an individual's conduct," requires "a 'textual analysis' focused on the ' "normal and ordinary" ' meaning of the Second Amendment's language." *Bruen*, 597 U.S. at 20 (quoting *District of*

*Columbia v. Heller*, 554 U.S. 570, 576-77 (2008)). That analysis by the Supreme Court found that the second amendment protects "law-abiding citizens." *Heller*, 554 U.S. at 625 ("For most of our history, the Bill of Rights was not thought applicable to the States, and the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens."), see also *Heller*, 554 U.S. at 644 (Stevens, J., joined by Souter, J., Ginsburg, J., and Breyer, J., dissenting) ("when it finally drills down on the substantive meaning of the Second Amendment, the Court limits the protected class to 'law-abiding, responsible citizens' "), *Bruen*, 597 U.S. at 78 (Alito, J., concurring) ("*Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun.").

¶ 79    *Bruen* did not disturb that conclusion. *Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742, about restrictions that may be imposed on the possession or carrying of guns."). In *Heller* and *McDonald* the Supreme Court held that states may restrict felons from possessing firearms. *Heller*, 554 U.S. at 626 ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"), *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons ***.' [Citation.] We repeat those assurances here.").

¶ 80    In this case defendant argues that there is no historical analogue for a permanent, status-based revocation of the right to keep and bear arms applicable to felons and therefore the AHC

statute is not consistent with the Nation's historical tradition of firearm regulation. This is, of course, an argument that the AHC statute does not pass constitutional muster under the second step of the *Bruen* analysis. Defendant admits that "[t]o evaluate the constitutionality of Illinois' [AHC] statute this Court must answer *two* questions: (1) whether [defendant] falls within the Second Amendment's protections at all, and (2) if he does, whether the historical record justifies a permanent ban on his ability to possess any firearm at any time." (Emphasis added.) As for the first question, defendant argues he is protected by the second amendment because it applies to "all Americans." Defendant cites *People v. Brooks*, 2023 IL App (1st) 200435, for the proposition that a felon's possession of a firearm falls under the conduct protected by the second amendment because, defendant argues, pursuant to *Brooks*, "a felon's status is irrelevant under the first step of the *Bruen* test." Defendant essentially argues that *Brooks* confirms that *Bruen* abrogated any presumption that barring felons from possessing firearms is permissible under the second amendment because *Bruen* and *Brooks* place the focus of the first step of the analysis on conduct—the conduct of possessing a firearm—and not status—in this case the status of being a felon.

¶ 81    We reject defendant's assertion that his conduct is protected by the second amendment and we disagree with the suggestion that a party's status as a felon is "irrelevant at this stage of the analysis." *Brooks*, 2023 IL App (1st) 200435, ¶ 89. The *Brooks* court found that the conduct at issue was "the defendant's possession of the firearm after having been twice convicted under any of the myriad of enumerated felonies [in the AHC statute], which in this case, both happen to be nonviolent." *Brooks*, 2023 IL App (1st) 200435, ¶ 86. Nonetheless, the court found that

> "[u]nder *Bruen*, the first step asks only whether 'the Second Amendment's plain
>
> text covers an individual's *conduct*.' [Citation.] This step does not contemplate

the actor or the subject. [Citations.] Accordingly, the defendant's status as a felon is irrelevant at this stage of the analysis. Instead, the defendant's possession of a firearm is 'presumptively constitutional.' [Citation.]" *Id.* We disagree.

¶ 82    Under *Bruen*, the first step looks at the conduct actually being regulated:

> "At the first step, the government may justify *its regulation* by 'establish[ing] that the challenged law *regulates* activity falling outside the scope of the right as originally understood.' [Citations.] The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. [Citation.]" (Emphases added.) *Bruen*, 597 U.S. at 18.

This court has recognized that "[f]irst, we must identify the conduct at issue to determine whether that conduct falls under the 'plain text' of the second amendment." *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 53. The conduct at issue under the AHC statute is not, broadly and generally, possession of a firearm. If it was, it would probably be unconstitutional. *Bruen*, 597 U.S. at 71 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). Rather, the conduct at issue under the AHC statute is the possession of firearms *by felons*. "If the government can prove that *the regulated conduct* falls beyond the Amendment's original scope, 'then the analysis can stop there; the *regulated* activity is categorically unprotected.' [Citation.]" (Emphases added.) *Bruen*, 597 U.S. at 18.

¶ 83    In *Bruen*, the Supreme Court's first word was that it had "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizens to possess a

handgun in the home for self-defense." *Bruen*, 597 U.S. at 8-9 (citing *Heller*, 554 U.S. 570, *McDonald*, 561 U.S. 742).

> "Though the *Bruen* Court did not define 'law-abiding citizen,' previous Supreme Court precedent identifies categories of people who have long been lawfully prevented from bearing arms. In *District of Columbia v. Heller*, the Supreme Court cautioned that

> > 'nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008).

> > There is little to expound here: by its plain language, the Supreme Court explicitly sanctioned the prohibition on the possession of firearms by felons." *Kelley*, 2024 IL App (1st) 230569, ¶ 17.

¶ 84 Further, the second amendment "does not distinguish between violent felonies and non-violent felonies." *United States v. Sloat*, 3:22-CR-30017-DWD, 2023 WL 8455112, at *1 (S.D. Ill. Dec. 6, 2023). In *People v. Travis*, 2024 IL App (3d) 230113, ¶ 37, the court held:

> "Under the AHC and UUWF statutes, both of which are facially constitutional, defendant is prohibited from possessing a firearm due to his status as a felon, irrespective of the violent or nonviolent nature of his convictions. We

decline to invade the province of the legislature to determine which convictions warrant a loss of rights." *Travis*, 2024 IL App (3d) 230113, ¶ 37.

see also *People v. Leonard*, 2024 IL App (4th) 230413-U, ¶ 15 ("defendant's previous felony convictions make him *not* a law-abiding citizen and, therefore, *not* protected by the second amendment. By incurring a felony conviction, even a nonviolent felony conviction, a citizen forever loses the constitutional right to have a firearm for the defense of his person and his house"), *People v. Langston*, 2023 IL App (4th) 230162-U, ¶ 19 (rejecting the defendant's request for the court to "interpret 'law-abiding citizens' to include those who had been convicted of nonviolent felonies"), *Muhammad*, 2023 IL App (1st) 230121-U, ¶ 21 (citing *Brooks*, 2023 IL App (1st) 200435, ¶ 100). Thus, the constitutionality of disarming felons extends to nonviolent felons.

¶ 85    We find that the regulated conduct under the AHC statute "falls beyond the Amendment's original scope" because the scope of the second amendment reaches only "law-abiding citizens." *Bruen*, 597 U.S. at 31-32 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."), *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 ("The *Bruen* Court could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant."), *Hatcher*, 2024 IL App (1st) 220455, ¶ 54 ("*Bruen* limits the second amendment's scope to (1) citizens who are (2) law-abiding and (3) responsible, and (4) who use firearms for self-defense."), *Muhammad*, 2023 IL App (1st) 230121-U, ¶¶ 18-23. Defendant, a twice-convicted felon, is not a law-abiding citizen.

¶ 86    This conclusion is not "defeated by *Rahimi*," as defendant suggests. In *Rahimi*, the Supreme Court addressed the constitutionality under the second amendment of a statute that

"prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." *Rahimi*, 144 S. Ct. at 1894. The Court rejected the Government's argument that *Rahimi* could be disarmed "simply because he is not 'responsible.' " *Id*. at 1903. The Court found that the term "responsible" is vague and that "[i]t is unclear what such a rule would entail." *Id*.

¶ 87    Although the Court "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right" the Court "did not define the term and said nothing about the status of citizens who were not 'responsible.' " But we do not find, despite what defendant claims about the State's argument, that defendant is not someone to whom the second amendment applies because he is not "responsible." The second amendment does not protect defendant's right to possess a firearm because he is not a law-abiding citizen.

¶ 88    Defendant cites a dissent in *Rahimi* in an attempt to refute "the 'law abiding *** citizen' test." The dissenting justice wrote:

> "At the outset of this case, the Government contended that the Court has
> already held the Second Amendment protects only 'responsible, law-abiding'
> citizens. [Citation.] The plain text of the Second Amendment quashes this
> argument. The Amendment recognizes 'the right of the *people* to keep and bear
> Arms.' (Emphasis added.) When the Constitution refers to 'the people,' the term
> 'unambiguously refers to all members of the political community.' " *Rahimi*, 144
> S. Ct. at 1944 (Thomas, J., dissenting).

We reject the dissent's contention that the second amendment protects anyone other than "law abiding citizens." See *Baker*, 2023 IL App (1st) 220328, ¶ 37 ("The *Bruen* Court could not have

been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant.").

¶ 89 Statutes prohibiting felons, including nonviolent felons, from possessing firearms are presumptively constitutional. *Rahimi*, 144 S. Ct. at 1902 ("*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' "). Therefore, the analysis stops here (*Bruen*, 597 U.S. at 18); the AHC statute is constitutional under the second amendment as applied to defendant—a twice convicted felon—and, necessarily, it is also facially constitutional (*Villareal*, 2023 IL 127318, ¶ 52).

¶ 90 CONSTITUTIONALITY OF AHC UNDER ARTICL I, SECTION 22

¶ 91 Defendant argues the AHC statute is unconstitutional on its face and as applied to defendant under article I, section 22 of the Illinois constitution. Article I, section 22, reads as follows: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. art. I, § 22. Defendant argues that by conferring the right to keep and bear arms on "the individual citizen" rather than "the People" (compare U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.")), the right to keep and bear arms under the Illinois constitution is broader than under the second amendment and protects a broader class of individuals, including those "with a legal status that might otherwise place them outside the political community," that includes defendant "as an 'individual citizen' of this State."

¶ 92    Defendant also argues that the prefatory language "[s]ubject only to the police power" does not narrow defendant's right so as to permit permanent felon dispossession. Defendant argues that the record of the Constitutional Convention shows that the delegates were concerned with regulating "certain types of arms under the police power, not certain categories of people." To the extent the delegates expressed concern about those who committed crimes possessing firearms, the comments reveal a greater concern for "felony convictions that revealed a tendency for violence," and those comments "have to be read consistently with the felon dispossession laws in effect at the time." Defendant argues that at the time of the convention there was no law permanently dispossessing felons of firearms, therefore, the language "[s]ubject to the police power" "cannot be read to countenance permanent felon dispossession." As applied to defendant, defendant argues that "because [defendant] was not using the gun in a dangerous way, nor were his prior convictions violent, the Illinois Constitution as applied to [defendant] does not preclude his possessing a gun."

¶ 93    The State responds that assuming *arguendo* that article I, section 22, does embrace defendant regardless of his felon status, the AHC statute is a proper exercise of the police power. In apparent response to defendant's argument that the meaning of "the police power" in article I, section 22, is only the power to restrict *violent* felons' possession of firearms *temporarily*, the State argues that, as explained in *People v. Travis*, 2024 IL App (3d) 230113, ¶ 41, our supreme court in *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 491 (1984), "recognized that Illinois' police power was 'intended to provide an "extraordinary degree of control" over the possession of firearms' and allows laws 'restraining or prohibiting anything harmful to the welfare of the people.' [Citations.]" The State argues that this court may not overrule that finding by our supreme court.

¶ 94 In *Kalodimos*, a village ordinance completely banned the possession of all operable handguns with limited exceptions. *Kalodimos*, 103 Ill. 2d at 490. Our supreme court had to decide the scope of article I, section 22, and whether the ordinance "passes muster under it." *Id*. The court found that the difference in the language in article I, section 22 from the language in the second amendment "were intended to broaden the scope of the right to arms from a collective one applicable only to weapons traditionally used by a regulated militia [citation], to an individual right covering a wider variety of arms." *Id*. at 491. However, "the explicit recognition of 'the police power' [is] a limitation on the liberty the provision affords." *Id*. Based on the report of The Bill of Rights Committee at the Constitutional Convention, our supreme court recognized that "the possession and use of arms is subject to an extraordinary degree of control under the police power." (Internal quotation marks omitted.) *Id*. at 491-92. The committee report described regulatory measures "that had been approved in other States as not infringing on individual right to arms" including "a total prohibition of 'the sale of some weapons in some circumstances.' " *Id*. at 492.

¶ 95 Our supreme court acknowledged, similarly to defendant's argument in this case, that "[t]he meaning of a constitutional provision depends, of course, on the common understanding of the citizens who, by ratifying the Constitution, gave it life." *Id*. at 492. However, the court also found (and defendant did not address) that "[t]his understanding *** is best determined by referring to the common meaning of the words used." *Id*. at 492-93. Our supreme court found that the plain language of article I, section 22, "leaves the right to bear any type of arms subject to the police power" and "belied any assertion that a majority of the voters must have interpreted the plain words of the provision as ruling out any specific regulatory measure." *Id*. at 493. "The official explanation which all voters received also left considerable leeway for regulation of guns

by stating that under section 22 'the right of the citizen to keep and bear arms cannot be infringed, except as the exercise of this right may be regulated by appropriate laws to safeguard the welfare of the community.' [Citation.]" *Id.* The court found that this interpretation is "consistent with the interpretation of the provision advanced by the delegates who voted to adopt it." *Id.* In *rejecting* an argument that the "police power" in article I, section 22 permitted the regulation of all classes of firearms but not a complete prohibition of any class of firearm, our supreme court stated that it "has long recognized that the police power comprehends laws 'restraining or prohibiting *anything* harmful to the welfare of the people' [citations] and no convincing evidence has been produced that the voters ascribed a different meaning to the term in the context of section 22." (Emphasis added.) *Id.* at 496.

¶ 96    Because the issue in *Kalodimos* was a complete ban on handguns, our supreme court held that, "[b]ased on the floor debates and the official explanation, as well as on the language of the provision, it is apparent to us that section 22, as submitted to the voters, meant that a ban on all firearms that an individual citizen might use would not be permissible, but a ban on discrete categories of firearms, such as handguns, would be." *Id.* at 498. Notably, the court *rejected* an argument that "there is no principle which permits the *complete abridgment* of one form of constitutionally protected behavior whenever other forms of behavior which enjoy the same form of protection and lead to a substantially similar end are permitted." (Emphasis added.) *Id.* at 499.

¶ 97    We interpret *Kalodimos* to mean the plain language of article I, section 22 does not rule out a complete and permanent abridgment of possession of firearms by felons. The *Kalodimos* court considered whether the ordinance at issue was a proper exercise of the police power. Although a different statute is involved here, apropos of this case our supreme court found that "the right to arms secured by the Illinois Constitution, which did not exist prior to 1970, is

subject, as we have explained, to substantial infringement in the exercise of the police power even though it operates on the individual level." *Id*. at 509. Subsequently, the Third District of this court held that "the AHC *** statute[ is] a proper exercise of the state's police power, which allows the state to exert, through legislation, control over the dangers posed by firearms and the people who might use them to do harm." *Travis*, 2024 IL App (3d) 230113, ¶ 43.

¶ 98    We agree that the AHC statute is a proper exercise of the state's police power that is contemplated by the "grant [of] an 'extraordinary degree of control' over the use of firearms" in article I, section 22. *Travis*, 2024 IL App (3d) 230113, ¶ 42 (quoting *Kalodimos*, 103 Ill. 2d at 491-92). To any extent *Travis* might be read to hold the AHC statute is a proper exercise of the state's police power on violent felons, we disagree; and, regardless, the point of its holding is that the police power "allows the state to exert, through legislation, control over the dangers posed by firearms and the people who might use them to do harm." *Travis*, 2024 IL App (3d) 230113, ¶ 43. The legislature could prohibit felons from possessing firearms to safeguard the welfare of the community. *Kelley*, 2024 IL App (1st) 230569, ¶ 30 ("nothing in article I, section 22, of the Illinois Constitution suggests that the right to bear arms is unlimited and bars the State from prohibiting felons from bearing arms."), see also *People v. Robinson*, 2023 IL App (1st) 220959-U, ¶ 53 (UUWF "is a proper exercise of police power, and therefore defendant has not shown that the statute violates the Illinois Constitution on its face or as applied to him.").

¶ 99    The AHC statute is constitutional as applied to defendant and on its face under article I, section 22, of the Illinois constitution.

¶ 100                                CONCLUSION

¶ 101   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 102   Affirmed.